IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JEREMY ROTHE-KUSHEL, | ) | |
| Lawrence, Kansas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-319 |
| | ) | |
| JEWISH COMMUNITY FOUNDATION | ) | **DEMAND FOR JURY TRIAL** |
| OF GREATER KANSAS CITY, | ) | |
| 5801 W. 115th Street, Suite 104 | ) | |
| Overland Park, Kansas 66211-1824, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LAUREN HOOPES, Executive Director, | ) | |
| Jewish Community Foundation of | ) | |
| Greater Kansas City, | ) | |
| c/o Jewish Community Foundation | ) | |
| 5801 W. 115th Street, Suite 104 | ) | |
| Overland Park, Kansas 66211-1824, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOSHUA STEIN, Director of Fund | ) | |
| Development, Jewish Community Foundation | ) | |
| of Greater Kansas City, | ) | |
| c/o Jewish Community Foundation | ) | |
| 5801 W. 115th Street, Suite 104 | ) | |
| Overland Park, Kansas 66211-1824, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KIM RAUSCH, Director of Development, | ) | |
| Truman Library Institute | ) | |
| 5151 Troost Avenue, Suite 300 | ) | |
| Kansas City, Missouri 64110 | ) | |
| | ) | |
| and | ) | |
| | ) | |

BLAIR HOWELL HAWKINS, )
c/o Clarence M. Kelley and Associates, Inc. )
6840 Silverheel Street )
Shawnee, Kansas  66226, )
)
and )
)
DETECTIVE BRENT PARSONS, )
c/o Kansas City Regional Terrorism Early )
Warning Interagency Analysis Center )
635 Woodland, Suite 2105-B )
Kansas City, Missouri  64106, )
)
and )
)
SERGEANT MICHAEL SATTER, )
c/o Kansas City Regional Terrorism Early )
Warning Interagency Analysis Center )
635 Woodland, Suite 2105-B )
Kansas City, Missouri  64106, )
)
and )
)
DETECTIVE MICHAEL CURLEY, )
c/o Kansas City, Missouri Police Department )
Police Headquarters, 1125 Locust )
Kansas City, Missouri  64106, )
)
and )
)
CHIEF RICHARD C. SMITH, )
in his official capacity as Chief of Police of )
Kansas City, Missouri Police Department )
Police Headquarters, 1125 Locust )
Kansas City, Missouri  64106, )
)
and )
)
LELAND SHURIN, )
in his official capacity as President and a )
member of the Board of Police )
Commissioners of Kansas City, Missouri, )
c/o Kansas City, Missouri Police Department )
Police Headquarters, 1125 Locust )

2

Kansas City, Missouri 64106,                    )
                                                )
and                                             )
                                                )
NATHAN GARRETT,                                 )
in his official capacity as a member of the     )
Board of Police Commissioners of Kansas         )
City, Missouri,                                 )
c/o Kansas City, Missouri Police Department     )
Police Headquarters, 1125 Locust               )
Kansas City, Missouri 64106,                    )
                                                )
and                                             )
                                                )
MARK TOLBERT,                                   )
in his official capacity as a member of the     )
Board of Police Commissioners of Kansas         )
City, Missouri,                                 )
c/o Kansas City, Missouri Police Department     )
Police Headquarters, 1125 Locust               )
Kansas City, Missouri 64106,                    )
                                                )
and                                             )
                                                )
DON WAGNER,                                     )
in his official capacity as a member of the     )
Board of Police Commissioners of Kansas         )
City, Missouri,                                 )
c/o Kansas City, Missouri Police Department     )
Police Headquarters, 1125 Locust               )
Kansas City, Missouri 64106,                    )
                                                )
and                                             )
                                                )
MAYOR SYLVESTER "SLY" JAMES,                    )
in his official capacity as a member of the     )
Board of Police Commissioners of Kansas         )
City, Missouri,                                 )
c/o Kansas City, Missouri Police Department     )
Police Headquarters, 1125 Locust               )
Kansas City, Missouri 64106,                    )
                                                )
                    Defendants.                 )

3

# COMPLAINT

COMES NOW Plaintiff Jeremy Rothe-Kushel, by his counsel, and for his causes of action against Defendants Jewish Community Foundation of Greater Kansas City, Lauren Hoopes, Joshua Stein, Kim Rausch, Blair Hawkins, Detective Brent Parsons, Sergeant Michael Satter, Detective Michael Curley, Commissioner Leland Shurin, Commissioner Nathan Garrett, Commissioner Mark Tolbert, Commissioner Don Wagner, and Mayor Sylvester "Sly" James, states and alleges as follows:

## DEMAND FOR JURY TRIAL

1. Plaintiff Rothe-Kushel demands a jury trial on all issues raised herein.

## PRELIMINARY STATEMENT

2. Plaintiff Rothe-Kushel brings this action seeking damages arising out of his removal from a public forum while engaging in free speech, assembly, and press/journalism and subsequent arrest on May 9, 2016, while attending the public portion of the inaugural Truman and Israel Lecture[1] in the Truman Forum Auditorium located within Kansas City Public Library, Plaza Branch at 4801 Main, Kansas City, Missouri, and participating in the question-and-answer session. Rothe-Kushel alleges that various of the defendants conspired to deprive and did deprive him of his civil rights. This Complaint also alleges that conduct and omissions that occurred prior to or after the event also gave rise, caused, or contributed to cause Plaintiff to suffer damages. Specifically, Plaintiff brings the following claims:

Count I - Deprivation of Plaintiff's First Amendment freedoms of Speech, Journalism/Press, and Assembly, brought pursuant to 42 U.S.C. § 1983;

---

[1]Frequently referred to herein as "the event".

4

Count II - Violation of Plaintiff's Fourth Amendment right to be free from wrongful seizure/arrest, brought pursuant to 42 U.S.C. § 1983;

Count III - Conspiracy to violate Plaintiff's civil rights, brought pursuant to 42 U.S.C. § 1983;

Count IV - Failure to train/inadequate training brought pursuant to 42 U.S.C. § 1983;

Count V - Failure to supervise/inadequate supervision brought pursuant to 42 U.S.C. § 1983;

Count VI - State law battery;

Count VII - State law false arrest; and,

Count VIII - State law conspiracy.

## PARTIES

3. Plaintiff Jeremy Rothe-Kushel is a male, a natural person, and a resident of Lawence, Douglas County, Kansas. He is a Jewish-Mexican-American.

4. Defendant Jewish Community Foundation of Greater Kansas City is a Missouri nonprofit corporation with its headquarters at 5801 W. 115th Street, Overland Park, Kansas. Its registered agent for service of process is BC Agent Services, Inc., 1200 Main Street, Suite 3500, Kansas City, Missouri 64105-2100.

5. Defendant Lauren Hoopes was, at all times relevant hereto, Executive Director of the Jewish Community Foundation. She was involved in the planning of the Truman and Israel Lecture and was present at the event.

6. Defendant Joshua Stein, was, at all times relevant hereto, Director of Fund Development for the Jewish Community Foundation. He was involved in the planning of the Truman and Israel Lecture and was present at the event.

7. Defendant Blair Hawkins was, between September 15, 2014 and November 4,

5

2016, the community-wide Director of Security for the Jewish Federation of Greater Kansas City, Inc., primarily based at the Jewish Community Center Campus. On information and belief, he is now employed by Clarence Kelley & Associates as Vice President of Operations and Chief Operating Officer. On May 9, 2016, he was working for the "Jewish community as director of security". He was in charge of security for the event.

8. Defendant Detective Brent Parsons is employed by the Kansas City, Missouri Police Department and is assigned to the Kansas City Regional Terrorism Early Warning Interagency Analysis Center (also known as the " Homeland Security Fusion Center"). In that capacity, Parsons met Defendant Hawkins through Hawkins' role as a member of the advisory board of the KCTEWC. On May 9, 2016, at Hawkins' request, he was working security in an off-duty capacity at the event. Hawkins also asked Parsons to arrange for additional officers to work the event. He is sued in his individual capacity.

9. Defendant Sergeant Michael Satter is employed by the Kansas City, Missouri Police Department and is currently assigned to the Kansas City Regional Terrorism Early Warning Interagency Analysis Center (also known as the "Homeland Security Fusion Center"). On May 9, 2016, he was assigned to the Shoal Creek Patrol Division. He was one of the off-duty officers Parsons arranged to have work as security for the event. He is sued in his individual capacity.

10. Defendant Detective Michael Curley is employed by the Kansas City, Missouri Police Department. He was one of the off-duty officers Parsons arranged to have work as security for the event. He is sued in his individual capacity.

11. Defendant Chief Richard C. Smith is the current Chief of Police of the Kansas

6

City, Missouri Police Department. Chief Smith is sued in his official capacity. On information and belief, he is a resident of the City of Kansas City, Missouri. By statute, the Chief of Police for the Kansas City, Missouri Police Department is the chief executive officer of the police department. MO. REV. STAT. § 84.500. Defendant Smith is responsible to the Board of Police Commissioners for proper administration of police affairs and the execution of policy pertaining to police affairs as determined by the Board of Police Commissioners. *Id*. The Chief has the power to appoint, subject to the approval of the Board, and has the power to promote, discipline, and suspend all police officers. *Id*. Among Chief Smith's duties and responsibilities, through the chain of command, are the training and supervision of Defendants Parsons, Satter, and Curley.

12. The Board of Police Commissioners of Kansas City, Missouri ("the Board") is a state agency that can be sued by serving and naming the individual members of the Board of Police Commissioners.[2] The Board is an agency created and existing in accordance with the laws of the State of Missouri, specifically, MO. REV. STAT. § 84.350. The Board is charged by statute with several duties and responsibilities. MO. REV. STAT. § 84.420. The Board is statutorily empowered to determine police policy and to that end, is required to, *inter alia*, adopt rules and regulations governing the conduct of the Kansas City, Missouri Police Department and its officers and employees and to appoint a chief of police who is responsible to the Board for proper execution of the policies, duties, and responsibilities established for the administration of the police department. The Board is empowered to provide and

---

[2]The members of the Board are collectively referred to herein as "Defendant Commissioners."

contract for liability insurance coverage for officers and employees insuring liabilities incurred during the performance of duty and in the scope of employment for the police department. *Id.* The Board is composed of the Mayor of the City of Kansas City and four members appointed by the Governor of the State of Missouri. MO. REV. STAT. §§ 84.350, 84.360.

13. The Board has exclusive management and control of its policies and practices regarding the method and manner of response to calls for officer assistance and is responsible for assuring that members of the Kansas City, Missouri Police Department conduct themselves in a lawful manner in undertaking their duties.

14. Defendant Leland Shurin is sued in his official capacity as President and member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri. MO. REV. STAT. § 84.350.

15. Defendant Nathan Garrett is sued in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri. MO. REV. STAT. § 84.350.

16. Defendant Mark Tolbert is sued in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri. MO. REV. STAT. § 84.350.

17. Defendant Don Wagner is sued in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri. MO. REV. STAT. § 84.350.

18. Defendant Sylvester "Sly" James is sued in his official capacity as a member of

the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri. MO. REV. STAT. § 84.350.

STATE ACTION

19. The acts and omissions of all Defendants herein which give rise to Plaintiff's federal claims were committed by them while acting under color of state law or were willful participants in joint activity(ies) with the State or its agents.

JURISDICTION AND VENUE

20. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1331. Further, this Court has jurisdiction under 28 U.S.C. § 1367 to hear Plaintiff's state law claims in that all claims made herein are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

21. This Court has jurisdiction over Defendants because the unlawful acts alleged in this Complaint were committed in Kansas City, Jackson County, Missouri, which lies within the Western District of Missouri.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events, acts, or omissions giving rise to Plaintiff's claims occurred in Kansas City, Jackson County, Missouri, which as provided in 28 U.S.C. § 105(b)(1), lies within the Western Division of the Western District of Missouri.

GENERAL ALLEGATIONS COMMON TO ALL COUNTS

*The Jewish Community Foundation and the Truman Library Institute Plan a Public Event at the Kansas City Public Library's Truman Forum Auditorium*

23. Circa 2015, the Jewish Community Foundation of Greater Kansas City (JCF) working in concert with the Truman Library Institute (TLI), established a lecture series to be

9

known as the Truman and Israel Lecture. The Truman and Israel Lecture was established to "explore President Harry Truman's courageous decision to recognize the State of Israel and the impact that decision had on world history."

24. The Truman Library Institute is a member-supported, nonprofit partner of the Harry S Truman Library and Museum which draws on President Truman's legacy to enrich the public's understanding of history, the presidency, and America's form of government.

25. Sometime during the fall of 2015, the JCF and TLI issued an invitation to former Ambassador Dennis Ross to appear as the speaker at the inaugural Truman and Israel Lecture and, on December 14, 2015, TLI Executive Director Alex Burden emailed JCF Executive Director Lauren Hoopes, copying others who were to be involved in organizing the Lecture, to advise her that Ross had accepted the invitation. After several emails were exchanged, May 9, 2016, was selected and confirmed for the lecture.

26. At the time that the date was selected, TLI and JCF began to consider a venue for the lecture.

27. The Kansas City Public Library (KCPL) stages many library events that are open to the public. The Plaza Branch of the KCPL has meeting rooms and an auditorium that are available to be used for such events. The auditorium at the KCPL Plaza Branch is known as the Truman Forum Auditorium.

28. By December 17, 2015, Burden had checked with the KCPL about the availability of the Truman Forum Auditorium for the Lecture, learned that it was available, and had asked the KCPL staff to "hold" the Forum for the event until further notice.

29. By January 11, 2016, Burden was able to advise Hoopes that he had reserved the

10

Truman Forum for the event. In an email exchange that continued into January 12, Burden and Hoopes arranged to meet on January 28 at the JCF offices to discuss the next steps for planning the event.

30. Also on January 11, 2016, Hoopes emailed Irvin Belzer, then the president of the JCF Board of Trustees and Merilyn Berenbom, a JCF Life Trustee, to tell them about the January 28 planning session and asked for their input and for suggestions as to other JCF Board members to include in the planning session. Berenbom responded later that evening and Belzer replied the next afternoon, suggesting that Mike Schultz, also a JCF Life Trustee, be included in the planning.

31. On January 27, 2016, Hoopes emailed Mike Schultz, Stanley Bushman (another JCF Life Trustee), and Josh Sosland (Immediate Past President of the Board), copying Merilyn Berenbom and JCF Director of Communications Brooke Hardy, confirming the date and place, but not the time, advising them that she and Hardy would be meeting with Burden the following day, and indicating that after the meeting, they would have basic facts locked down so that the Board could be advised and JCF could commence a marketing strategy.

32. On January 28, 2016, Hoopes, Hardy, and Burden held their planning session and the following day, Hoopes sent an email to Belzer updating him on what had transpired.

33. In her January 29, 2016 email to Belzer, Hoopes related that Burden had expressed having some reservations about the use of the Truman Forum. The Forum was generally provided to the TLI gratis because of a long-standing partnership between the TLI and the KCPL. Burden was concerned that R. Crosby Kemper III, Director of the KCPL, would insist on being credited as a co-sponsor of the event and would want a piece of the

11

event time to promote the KCPL. As a possible alternative to the KCPL space, Burden suggested Unity Temple on the Plaza, which is a larger space that the TLI used to present the Bennett Series on the Presidency. Hoopes and Burden agreed that Burden would speak to Kemper to see if he was comfortable with the KCPL playing a different role for the event, even if it meant paying for the use of the space, noting there was money in the budget for space rental. If Kemper was uncomfortable, Burden would reach out to Unity.

34. Also in her January 29, 2016 email to Belzer, Hoopes outlined the event. The plan was to hold a reception prior to the Lecture from 5:30 to 6:30 p.m. to which JCF fund holders and TLI donors would be invited. The Lecture was to begin at 7:00 p.m. with a book signing following the speech. The reception was by invitation only, with attendees receiving priority seating, but the Lecture itself and the Q-and-A session following Ambassador Ross' speech, was to be ticketed, but would be free and open to the public.

35. Hoopes also related that during the planning session, a preliminary discussion about promoting the event was held and Hardy was beginning to work on that. Once a final decision about the venue was reached, the plan was to issue a joint press release. There would be a branded "look" for the series to be used for this event and others in the future, and a "save the date"mailing was contemplated to be issued in the next three weeks.

36. Hoopes' email also provided details about the actual Lecture portion of the event. She indicated that it was anticipated that Belzer would welcome the audience on behalf of the JCF and talk about the inception of the idea of a collaboration with the TLI and building a partnership with TLI for the White House Decision Center and the Lecture Series and would thank donors and sponsors of the projects. He would speak about the philanthropic

relationship between the Foundation, its donors and funding partners and the broader Kansas City community and then would introduce Clifton Truman Daniel.

37. Clifton Truman Daniel, the eldest grandson of Harry Truman, serves as the honorary Chair of the TLI. The plan, as related in Hoopes' January 29 email, was for him to welcome the audience on behalf of TLI and introduce Ambassador Ross. Ross would then give his speech. Then, Belzer would thank Ross and the audience, would thank the TLI and encourage attendance at the Truman Library and Israel White House Decision Center (WHDC). Belzer would then thank the Jewish community for attending and for partnering with the JCF, and would remind the audience of the book signing.

38. Finally, Hoopes' email concluded by noting that Burden and Mary McMurray, Director of the WHDC and developer of the Truman and Israel Module would attend the March 8 Board meeting to update everyone on the collaboration.

39. Belzer responded to Hoopes, indicating that the plan looked "excellent" and that he was comfortable with the format for the evening.

40. After hearing from Belzer, Hoopes emailed Burden and sent him the same agenda she had presented to Belzer, letting him know that Belzer was comfortable with the agenda.

41. Also on January 29, 2016, Hoopes sent Defendant Blair Hawkins an email with the subject heading, "Early Heads Up." She informed Hawkins that the JCF would be "co-sponsoring, with the Truman Library" the inaugural lecture of what would be an occasional series on President Truman and the establishment of Israel. She told him that the date was May 9 and that the speaker was former Ambassador Dennis Ross. She observed that the event would be held off-site, either at the KCPL or the Unity Temple, and that the event

13

would be ticketed, but free of charge.  She advised Hawkins that the Lecture would be widely promoted throughout Kansas City and that there would be a pre-Lecture Reception by invitation only and a post-Lecture book signing.  She stated that they expected 150 people at the reception and 500 to attend the Lecture and indicated that final details on location and exact timing would be determined in the next ten days.  Finally, she asked Hawkins to remind her of the protocol for security at such events and to let her know how he would like to be kept in the loop.

42.  A few days later, on February 3, 2016, Burden emailed Hoopes to tell her that Unity Temple was available on May 9 and offered to chat.  She inquired as to whether Kemper was okay with being a "silent"/anonymous partner.  Burden responded that they could present the use of the Truman Auditorium in a way that would eliminate the issue and had done so before.  They agreed to have a phone conference later that afternoon.

43.  By February 18, 2016, a decision had been made to use the KCPL Truman Forum Auditorium.  On that day, Hoopes again emailed Hawkins that she was checking back in with him about the event.  She elaborated on her earlier email indicating that the event would be at the KCPL Truman Forum Auditorium and that the event was to begin with an invitation-only reception, would progress to a "ticketed-but-open-to-the-public lecture" at 7:00 p.m., followed by a book signing.  She asked that Hawkins let her know what arrangements needed to be made and how much to budget for the security.

44.  Hawkins replied that afternoon.  He stated that the officers were $40 per hour with a minimum of three hours and that he would put Hoopes in contact with the person with whom she should make payment arrangements.  He speculated that he and two officers might

be needed, but said he would need to look over the location before committing to a number of officers. She responded that she would try to identify the person with whom Hawkins should meet at the library.

45. By February 22, 2016, Hawkins had made contact with Defendant Brent Parsons about working security at the event because he emailed Parsons that day to ask what date during that week or the next would work for Parsons to "check out the library." He also emailed Hoopes that he was planning an advance visit to the library with a KCPD officer that week or the next.

46. Two days later, on February 24, Hawkins emailed Hoopes to see if she had identified the contact person for the library. She replied that she had a staff person looking into it, would check with her, and get back to Hawkins later that morning.

47. A few minutes later, Communications Director Brooke Hardy emailed Ritchie Momon, KCPL Director of Branch Operations and Events, to inquire about the person with whom Hawkins could coordinate security for the event. He, in turn, handed off the request to Public Affairs Administrative Assistant Bethany Rowell, asking that she reach out to Brooke regarding security and catering. Rowell emailed Hardy, saying that "Since this is a Public Affairs event," she could answer any questions Hardy might have. She outlined the requirements for serving alcohol, indicated that as with any event in that level of the library, they would also be providing their own security officer, said Momon would be happy to meet with Hawkins to view the space but had asked that both Hawkins and the caterer be there at the same time. Hardy said she would share Rowell's contact information with Hawkins so he could make arrangements to see the space and would see if the caterer could also be present.

48. Still on the morning of February 24, Hardy emailed Hawkins with Rowell's contact information and relayed the request that the security and catering tours occur at the same time.

49. At about the same time she emailed Momon, Hardy had also emailed Susan Medler, Director of Communications for the TLI and asked if she knew who should be contacted about security at the event. A few hours later, a little before 1:30 p.m., Medler replied that she was "probably too late to be helpful," but recommended calling Steve Woolfolk.

50. Meanwhile, Hawkins had gone to the library on February 24 to look over the site. He emailed Hoopes that evening that he had discovered that they would need, in addition to him, three officers instead of two. He indicated that he had some questions and proposed that they meet, perhaps for lunch. He added that he had additional events that ranged from equal to four or five times larger that were to be held around the same time and was eager to lock down arrangements. The next morning, Hoopes responded that lunch was not likely due to prior commitments but could meet that afternoon or for coffee.

51. On the morning of March 22, 2016, Hoopes emailed Hawkins to double check the cost of security for the event. The email evidently prompted a phone or face-to-face conversation because about half an hour later, she emailed Burden, copying Hardy and Belzer, that the cost of security would be right around $500.00.

52. By April 6, 2016, the news release had been prepared and forwarded by the TLI to Barbara Bayer, Editorial Director of MetroMedia Publishers & Kansas City Jewish Chronicle, who, in turn, forwarded it to Brooke Hardy on April 7. The release indicated in

16

bold type that the program was free and open to the public, that seating was limited and on a first-come basis, and strongly encouraged those who wanted to attend to RSVP. A few days later, Constant Contact sent Hardy a copy of the message that subscribers received. Although the message misstated that the doors would "open to the public at 6:30 p.m. for a wine and coffee reception," it correctly stated that the program would begin at 7:00 p.m. It stated that the program was a free public program with seating on a first-come basis. It provided a link for those who wanted to attend to RSVP.

53. By April 19, 2016, Hardy had discovered that KCPL was accepting RSVPs on their website and listing itself as a co-presenter. She emailed Judy Turner about the discovery and asked if KCPL was providing RSVP information so that they would have a reliable count. Susan Medler at TLI responded that she and Turner had just seen it and captured screenshots. They were going to ask Burden to touch base with the head of public affairs for KCPL.

54. The next day, Hardy emailed Hoopes about the discovery of information about the Lecture on the KCPL website and its active collection of RSVPs. She related that she had emailed Medler and Turner at TLI and learned that they too had just discovered it. She continued that she had later received a phone call from Medler reporting that Burden had spoken to someone at the library about the issue. Medler had related that the library felt that it could identify itself as a co-presenter because JCF and TLI were not paying to use the venue. Hardy believed that Burden had asked that the library share the RSVP information with the security team but was unclear if the KCPL had agreed to do so. She suggested Hoopes might want to talk directly with Burden to get a clearer report of his discussion with

17

library personnel.

55.  On April 26, 2016, Hoopes emailed Hawkins asking if he would give her the name of the person at KCPL with whom he spoke about security and suggesting they ought to have a conversation early the next week about "chain of command."  Hawkins responded that they could never match a date for his advance tour, so he did it with the police on their own and met with a staff member who was working that day.  He had called the main office and left multiple messages.  He had been told that KCPL did not have the schedule of who would be working the night of the event, but indicated he would call again the next day.  She replied, asking that he let her know when they connect so she could share the information with event organizers.

56.  On April 29, Vicky Patterson, Meeting Room Support Assistant for KCPL (who used the email address public scheduling <scheduling@kclibrary.org>), emailed Hawkins after they had spoken.  She provided the contact information for the technicians who would be working the event.  She acknowledged that he had also asked for contact information for the KCPL security and said she would provide the information as soon as she found it.

57.  On May 2, 2016, Brooke Hardy sent Hawkins the "Truman and Israel event information [he] requested."  She further indicated, "Someone from the Truman Library is sending me a list of general admission rsvps which I will forward to you when I receive it."  She reiterated the date and timing of the reception and that 200 people were expected for that portion of the evening; when the doors to the general public were to open and that another 200 people would join, noting that they would have access to both the reception space and the auditorium; and, that the lecture would begin at 7:00 p.m. in the auditorium.  She listed

18

all the ways they had promoted the event. On May 3, Bethany Rowell sent Judy Turner the list of potential attendees which included Rothe-Kushel's name.

58. Also on May 2, Hawkins forwarded to Hoopes a revision of Patterson's email (it added last names of the three KCPL employees who would work the event). She responded by asking if he could participate in a conference call the following day, and on May 3, emailed the phone number and code for the call to him.

59. Hawkins did participate in the conference call. Also on the call were Lauren Hoopes, Alex Burden, and another female. During the portion of the conference call that was dedicated to security procedures, the discussion included the number of officers believed to be needed, what the security plan was for a fire, for an evacuation, and then the topic turned to how they would deal with protesters.

60. Hawkins recalled that Lauren Hoopes had brought up the topic and one of the individuals on the call dismissed protesting as being something unlikely to happen. But then he was told that if there was a protester, he would remove that person. Hawkins told the call participants that he would not remove anyone without direction. One of the callers replied that it would be obvious if there was a protester. Hawkins stated that what was "obvious" is different to different people so he needed direction as to what "obvious" would be. A call participant said that there might be protest signs and that would be obvious. Hawkins reiterated that he needed direction to be able to remove someone. So ultimately, an arrangement was made for the protester to be pointed out, and Hawkins would be pointed out which would be a signal to remove the protester and then the female voice that did not identify herself said, "or the microphone will be shut off."

61. On May 4, 2016, Belzer emailed Hoopes asking about arrangements for security indicating that he wanted to be sure they had the best possible security arrangements. She replied that Hawkins had coordinated with KCPD and that Hawkins and three officers would work the event.

62. By May 6, 2016, Hoopes had learned that they had received 625 RSVPs for the event. She asked Hardy to inform Hawkins of that fact and to note that they might need additional security since they originally were expecting only 425. In her email to Hawkins, Hardy observed that the auditorium seats 550 and that overages would be directed to the overflow space on the main floor of the library where chairs would be set up to stream the lecture.

63. A few minutes after Hardy sent that email to Hawkins, she received an email from TLI's Medler, attaching an "Event Flow" for the Lecture which detailed various arrangements, provided phone numbers for TLI and JCF staff, the photographer and caterer, and identified outstanding questions and "to-dos". It noted that "the 7pm program is open to the public and expected to be at capacity" and that reception attendees would receive priority seating "before the doors open to the public at 6:30 pm."

*Public Events at the Kansas City Public Library*

64. Steven Woolfolk is the KCPL's director of programming and marketing. When the KCPL holds an event that is open to the public, Woolfolk works in advance of the event to try to ascertain what will take place; prepares KCPL staff for what will happen at the event; takes steps to meet the needs of the speaker including helping to determine when the speaker will arrive; and, makes arrangements for someone to provide opening remarks for

20

how any question-and-answer session ("Q-and-A") will be handled.

65.   During an event, Woolfolk's role is to monitor the space to make sure that everything is running smoothly.  When, as was the case with the Truman and Israel Lecture, it is a really large event, his job is a little more complicated because there is an overflow space on the upper floor where events are shown on a large screen for those who cannot be accommodated in the auditorium.  That would entail occasionally going upstairs to make sure the screen was operating properly and there were no concerns with sound that would have to be addressed on the lower level.

66.   Woolfolk is only involved in events that are public library events; private events are handled by a different person.  Public events are included in the KCPL calendar of events and are publicized on their website's online calendar.  The primary reason for the separation between the public and private events is the fact that KCPL is supported by taxpayer dollars and if an event is not open to the public, they do not view it appropriate to use tax dollars to promote an event that the general public cannot attend.

67.   The KCPL is part of a political subdivision of the State of Missouri and in 1988, the Library established itself as an independent taxing authority.

68.   If the event is private, the parties have to execute a contract with the library.  The KCPL employee who handles private events simply makes sure the contract is signed, the room is booked, and communicates to the audiovisual team what will happen.  That person then steps away from the event because how well the program runs is not a concern of Woolfolk's team if it is not a library event.  A contract would have to be executed in order for the library not to be involved.  In such a case, no one from the public affairs team would

work the event, so neither Woolfolk nor his boss Carrie Coogan would be there.  There was

no written contract or payment for the use of the space for the Truman and Israel Lecture.

69.  The library staff members try to be lenient when the KCPL holds a public event

that includes a Q-and-A session.  If a question is asked that evokes a negative response from

audience members, they do not consider that to be a concern to the library.  Free speech is a

key tenet of everything the public library does.  As a general rule, audiences at library events,

even if offended by something, are appreciative of the fact that they are exposed to ideas that

may or may not change their views.  If nothing else, the exposure provides an idea of what

someone else thinks about a given issue.

70.  The KCPL does not typically have a moderator during Q-and-A sessions.  There

can be one if the speaker requests it, but more often than not, the speaker makes the transition

and that was what was agreed to for the Truman and Israel Lecture.  At the conclusion of his

presentation, Ambassador Ross indicated that there were microphones if people wanted to

ask questions and questions were posed.  If the library staff thinks a question has gone on too

long, they typically approach and, in effect, say, it's gone a little too long, we have other

people in line that we need to get to, can you wrap up this last part of the question and we'll

move on to the next person.  In Woolfolk's experience of eleven years, that strategy had

worked every time it had been employed.  The library has never had a scenario where

someone had to be physically restrained and removed.

*The Kansas City Public Library Becomes the Venue for the Truman and Israel Lecture*

71.  The KCPL public event staff was contacted by Alex Burden about doing the

Truman and Israel Lecture.  Woolfolk was familiar with Burden in his role as Executive

Director of the TLI because the library had done a number of successful programs with the TLI in the past. When Burden called and said they had a program they would like to work with the library on, the library staff were willing to do it. KCPL staff had never had any negative interactions with Burden and all of the programs they had previously done with Burden had taken place without any problems.

72. Woolfolk's understanding was that the JCF was a third co-sponsor of the event, that they had received a grant to fund the series and that TLI was more on the planning side. He further understood that TLI wanted to involve the KCPL both because they had the venue and because the KCPL's marketing machine for events was unparalleled in Kansas City and they knew that involving the KCPL in the event would guarantee a large crowd.

73. There was to be a large crowd of people attending the event. As it happened, the 550-seat auditorium was full, there were people standing in the auditorium as well, and there were between 100-125 people watching on closed circuit upstairs on the main floor of the library. Woolfolk and KCPL staff made sure the equipment upstairs was working properly before the event began and would periodically check to make sure that if there were problems with video or sound they were resolved.

74. The heightened security for the Truman and Israel Lecture was a first for the KCPL. On rare occasion, KCPL had an off-duty police officer when the speaker requested it, but no problems had arisen.

75. Woolfolk's team found out one day before the lecture that the JCF and TLI intended to have off-duty police officers at the event. Burden called Woolfolk and Coogan and the three had a lengthy conversation about how the security would work.

76. Burden asked Woolfolk and Coogan if they were "okay with" off-duty police officers being there. Woolfolk was generally not okay with it because his view is that in a venue where the free exchange of ideas is promoted, the presence of an armed officer of the state, whether or not intended, could chill what people might be willing to say at the microphone.

77. However, on April 13, 2014, there had been three people killed in shootings at the Jewish Community Center and Village Shalom, a Jewish retirement community, both in Overland Park, Kansas. The KCPL staff understood that because of the shootings, there was an elevated level of concern and so they agreed to allow the off-duty police officers to be there for the event.

78. The KCPL staff put two conditions on their agreement to allow the off-duty officers to be present. First, no one could be removed from the library for asking a question that was perceived to be unpopular or disliked. Second, if officers thought someone needed to be removed, unless that person posed an imminent threat, the officers would consult library staff before making the decision to remove the individual. Burden agreed to those conditions, so the KCPL staff agreed to allow the off-duty officers.

79. The library staff with whom officers would consult – should the need arise – were Woolfolk or Coogan. In the call with Burden, it was agreed that it could be either Woolfolk or Coogan, along with Burden for TLI and whoever they wanted from the JCF to make such a decision. Woolfolk told Burden that he would be standing off to the side and they could find him, they would talk about it, and decide whether someone needed to be removed.

24

*Plaintiff Rothe-Kushel Attends the Public Lecture*

80. For over 10 years, Rothe-Kushel has surveyed local public event calendars with an intent to attend, learn from, participate in, and often document public conversations about core political issues. Rothe-Kushel occasionally visited the KCPL website and in one of those visits he saw information about the Truman and Israel Lecture. The subject matter of the history of the United States and Israel was of interest to Rothe-Kushel and the lecture was to be given by Ambassador Ross, whose background was in foreign policy of concern to Rothe-Kushel.

81. Rothe-Kushel is a Jewish-Mexican-American who grew up in Los Angeles, who was bar mitzvahed at Wilshire Boulevard Temple in Los Angeles.

82. Rothe-Kushel is a documentarian, has engaged in politics and has written, publicly spoken, and published video documentation about politics for approximately ten years. After learning about the event and that the public was invited to the speech, and intent upon gathering information as a news documentarian, he RSVP'd through the library within a week before the event.

83. Rothe-Kushel wanted to attend the event and, because of his work as a documentarian, he would definitely participate by exercising his personal as well as his personally-held press rights. If there was a if there was a Q-and-A session, he would consider asking a question at the microphone. He was focused on engaging in press functions such as recording with video and audio and perhaps taking notes. There was to be a book signing and in his experience a more direct journalistic encounter that can provide a fruitful exchange of ideas or a telling evasion of facts can result from a one-on-one dialogue

25

during or after a book signing.

84.  On May 9, 2016, Rothe-Kushel had arrived at the library building around 5:15 to 5:20 p.m.  He parked on the street outside and went inside to meet McCarron in the entry lobby area.  They conversed for awhile and around 6:00 p.m., it appeared that people were about to go into the event.  Rothe-Kushel thought that it might be time to show confirmation of his RSVP and go into the event.  At that point, he was notified that there was a private event for VIPs before the public event so he went to get his dinner from the car and eat it outside.

85.  While Rothe-Kushel and McCarron were outside, Hawkins had been watching them and Rothe-Kushel had gotten a sense that they were being watched and that there was attention directed at them.  Rothe-Kushel did not know who Hawkins was but saw him come out and look very intently at them as they were talking and he was eating.  Unbeknownst to Rothe-Kushel, Hawkins photographed him and sent a photograph of Rothe-Kushel and McCarron to the rest of the security team, *i.e.*, Parsons, Satter, and Curley.

86.  Rothe-Kushel did not know why they were getting that kind of attention and was a little bit surprised.  He considered the possibility that since he had RSVP'd and had been on the public record around political issues, some of which are considered controversial, that had caused attention to be directed his way at times.

87.  After the reception ended, Rothe-Kushel and McCarron went downstairs to go to the auditorium.  But perhaps 15 to 20 feet beyond the bottom of the staircase, they were intercepted by Sergeant Satter.  Satter was in uniform and he asked to search them.  Satter had seen them and called Hawkins on the radio to see if Hawkins wanted the individual

whose photograph he had sent the security team searched. Hawkins had said to search them before they went into the event.

88. Rothe-Kushel asked Satter why he was searching their belongings. He did not want to be combative but wanted to know the parameters of the nature of the search because it did not appear that other people were that were walking by were being searched. His first thought was that he had a big beard and that maybe it was thought that he was a Muslim fundamentalist or something similar.

89. Rothe-Kushel knew he had not engaged in any conduct that would necessitate a search but recognizing that he had nothing to hide and was peacefully and constructively engaged in attending a public event, showed Sergeant Satter the contents of his attaché case. Rothe-Kushel also let Satter open the bottle of water he carries and smell its contents. Rothe-Kushel and McCarron also emptied their pockets for Satter.

90. Rothe-Kushel's attaché case contained articles related to his First Amendment-protected activity such as his camera, notebooks, notepads, and books. Wondering whether his public involvement in political speech and the press was at the root of the search, Rothe-Kushel told Satter that he was "on the record of asking political questions that some public figures find uncomfortable and I document the response for the public record." Satter acknowledged Rothe-Kushel's right to do such things and then allowed them to enter the auditorium.

91. Upon information and belief Rothe-Kushel and McCarron were two of only three persons searched by police prior to entering the auditorium. Given that neither Rothe-Kushel nor McCarron appeared "out of place" in terms of dress or mannerisms, Hawkins had prior

knowledge of one or both persons prior to the event. Hawkins would have obtained this information from one or more sponsors who had the list of persons who had RSVP'd and then, presumably, searched various databases for information regarding the potential attendees. Sergeant Satter assumed that Hawkins had "intelligence" on them because he somehow knew who they were.

92. Rothe-Kushel and McCarron continued into the auditorium and found seats on the far side. Rothe-Kushel noticed Carrie Coogan, who looked like she worked for the library, and asked her whether he could record and she said yes, and asked if anyone had told him differently. Rothe-Kushel said that no one had, but he wanted to make sure. While they were talking, he noticed to her left what looked to be a member of security in plain clothes. He did not pay much attention, but became aware that security was present.

93. After the introductory remarks, Ross began speaking and Rothe-Kushel began documenting, recording the speech.

*Unusual and Unprecedented Procedures Are Requested for the "Q-and-A" Session*

94. Leslie Case is a KCPL employee who works as an audiovisual technician. On the night of the event, she was lead technician. Prior to the Truman and Israel lecture, she had never had a co-sponsor ask her to cut off the microphone.

95. Just before the Q-and-A began, two individuals, at least one of whom was a male from the JCF, and on information and belief, was Defendant Joshua Stein, approached Case while she was still paying attention to the lecture and trying to make sure all of her microphones were set up properly. The man told her that he was going to be in a particular location in the auditorium monitoring the Q-and-A and that if he gave her a signal he needed

her to cut off the microphone.

96. TLI Director of Development Kim Rausch also approached Case and said she was going to be monitoring the microphone that was on the opposite side.

97. Case found the arrangement to be somewhat surprising because it had not been discussed with her until right before the Q-and-A was to begin. Case was concerned about it and wondered if perhaps something had not gotten communicated to her before so she was not sure if she was compelled to do what the individuals had asked given that it was a public event. She concluded that she should use her own best judgment.

*The "Q-and-A" Session*

98. Rothe-Kushel was not certain at first that there was going to be a Q-and-A session, but at the end of Ross' speech, it became apparent. He decided to ask a question and gave his camera to McCarron to continue recording. At first, he experienced the bit of trepidation that accompanies speaking publicly and bringing up facts he believes are important for the public conversation but that are either not widely known or are controversial.

99. Rothe-Kushel wanted to ask the Ambassador about the fact related in Margaret Truman's book concerning a militant Zionist group that had sent mail bombs to President Truman the year before he recognized the existence of the Israeli state.

100. Rothe-Kushel made his way to one of the two microphones and started to ask the following question:

"Hi, thank you. I'm very interested in the issue of tribalism and terror. Just today, I ran into an article referencing Truman's daughter's, Margaret's book, disclosing that the Stern Gang sent mail bombs to Truman in '47, and we know that when I think – I can't remember which group blew up the King David Hotel, but Jews were amongst

29

the dead involved in that 'necessary statecraft', what ultimately became that. So you see this long history of not only the United States, but Israel utilizing terrorism that includes potentially the death of its own tribe to advance its own geopolitical cause all the way up into the 21st century, including September 11th and that whole mess that I would tell people to look at Alan Sabrosky, the Jewish, courageous Marine who's exposed the Zionist role in that. So, I would ask you, at what point does the Jewish diaspora – do we have to have the ethical courage – I'm a Jewish American – to point out that especially in America, both the countries that operate in our name have used terrorism way too long, including against its own citizens, to project power at home and abroad. When are we going to stand up and be ethical Jews and Americans?"

101. During the question, Defendant Joshua Stein approached Rothe-Kushel from the right and leaned in to within inches of him.

102. In the middle of Rothe-Kushel's initial question, Kim Rausch raised her hand while looking at Case to signal that Case should cut off the microphone. Case considered that Rothe-Kushel's tone of voice was civil and he was not acting in a way that would inflame the audience and she decided not to cut off Rothe-Kushel's question by turning off the microphone.

103. In Case's experience, there have been presenters at library events who have had to deal with questions they did not particularly like. Most of the time, and this was the case with Ambassador Ross, the presenter just pushes the question aside and doesn't necessarily answer it, but rather, dismisses it out of hand.

104. Unbeknownst to Rothe-Kushel, Hawkins had advised on the radio that someone needed to be removed. Hawkins had provided Parsons, Satter, and Curley with radios. Satter also had his police radio.

105. In response to Rothe-Kushel's question, Ross said something to the effect of, "I believe it was once said that 'everyone is entitled to their own opinion but not entitled to their own facts.'" That response, which Case considered to be somewhat snarky, elicited a

30

response from the audience members, some of whom clapped.

106. Case was standing in her booth watching so she could see which Q-and-A microphone was being used and could properly adjust microphone levels. There are two aisles in the auditorium and Rothe-Kushel was asking his question from the aisle that was situated directly in front of Case's booth. Hawkins came out of the audience and all of a sudden was physically removing Rothe-Kushel from the microphone. There was no opportunity to invite Rothe-Kushel to cede the floor to other questioners.

107. Case found it shocking. In her experience, there had been many event attendees that have had passionate arguments for their questions and never before had the KCPL staff had to bodily remove anyone from the premises.

108. Ross responded to Rothe-Kushel's question and as Rothe-Kushel began to further respond, he felt a hand grab his upper left arm and he got the sense that the microphone had been muted. It was Hawkins. The touch felt aggressive to Rothe-Kushel and he perceived it as more of a serious grab and not as though it was a gentle prod to tell him they were going to move on to the next questioner.

109. Hawkins made his first contact with Rothe-Kushel by gripping his arm and saying, "You're done," a statement Rothe-Kushel did not hear.

110. Rothe-Kushel, a member of the public attending a public event, pulled away and said to Hawkins and the audience, "Do not touch me! Get your hands off me right now! You can ask me to leave. I will leave if asked. I will leave if asked. I will leave if asked. Get your hands off me!" Hawkins maintained his grip on Rothe-Kushel as Parsons attempted to grab him.

111. Hawkins shifted his grip on Rothe-Kushel and spun him around as Parsons assisted Hawkins in shoving Rothe-Kushel away from the microphone.

112. As Rothe-Kushel was being shoved away from the microphone by Hawkins and Parsons, KCPL's employee, Steve Woolfolk, attempted to de-escalate the situation.

113. Woolfolk approached Hawkins and Parsons because what was happening to Rothe-Kushel violated the agreement he had obtained less than twenty-four hours earlier regarding allowing off-duty officers to be present. Specifically, Hawkins was removing somebody from the building for asking an unpopular question.

114. Rothe-Kushel and Woolfolk walked to the seats where McCarron was still sitting and recording. They were followed by Hawkins, Parsons, and Satter. Rothe-Kushel picked up his attaché case, McCarron was told, "You're gone," and the group followed Woolfolk out the side door.

115. In the hallway, Defendant Curley told Rothe-Kushel, "Com'ere." Rothe-Kushel asked Curley what the nature of the stop was, to define the parameters of the stop, and what the crime was. Curley responded, "There is no crime." Parsons came over and he and Curley handcuffed Rothe-Kushel as Rothe-Kushel asked "What is happening?". Still no one said that he was arrested or for what he was being arrested.

116. Rothe-Kushel was booked and was charged on GOS # 2G104757 with trespass (knowingly enters unlawfully/knowingly remains unlawfully in or on a building in that he was advised to leave the premises and refused to do so) and on GOS # 2G104758 with obstructing or resisting public safety officer, employee, or inspector by pulling away while being arrested.

117.  The prosecutor filed an entry of *nolle prosequi* on the original trespassing charge against Rothe-Kushel on June 15, 2017.  The prosecutor filed an entry of *nolle prosequi* on the obstruction of justice by resisting charge on July 31, 2017.  There was no consideration in exchange for the dismissals.

118.  Plaintiff Rothe-Kushel has been damaged as a direct and proximate result of Defendants' actions.  In particular, he has suffered injuries including but not limited to violation of his First Amendment rights to speech, assembly, press, and petitioning the government for redress of grievances; his Fourth Amendment right to be free from unreasonable seizure and arrest; he also suffered inconvenience, insult, mental distress, embarrassment, humiliation, anxiety and emotional pain and suffering.  His arm was grabbed by Hawkins and/or Parsons so forcefully that it caused bruising.  He has incurred legal fees and expenses in defending charges in municipal court.

119.  With respect to Plaintiff's claims brought to vindicate violations of his constitutional and federal rights alleged herein, Defendants' actions were willful, wanton, reckless, and malicious, and, further, show a complete and deliberate indifference to and conscious disregard for, the rights of Plaintiff Rothe-Kushel.  Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future, as more specifically alleged, *infra* at ¶¶ 125, 136, 146, 156, 166.

120.  With respect to Plaintiff's claims brought pursuant to state law, Defendants' conduct was willful, wanton, reckless, and malicious, and was outrageous because of Defendants' evil motive or reckless indifference to, and conscious disregard for the rights of

33

Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future, all as more specifically alleged, *infra* at ¶¶ 173, 178, 185.

## COUNT I
### FIRST AMENDMENT VIOLATION
### 42 U.S.C. § 1983
### (Against Jewish Community Foundation,
### Lauren Hoopes, Kim Rausch, Joshua Stein, Blair Hawkins, and Brent Parsons)

121. Plaintiff hereby incorporates by reference paragraphs 1 through 120 as if fully set forth here.

122. Defendants JCF, Hoopes, Rausch, Stein, Hawkins, and Parsons deprived Plaintiff Rothe-Kushel of his right to free speech as guaranteed by the First Amendment to the Constitution of the United States and secured against the States by way of the Fourteenth Amendment.

123. Defendants JCF, Hoopes, Rausch, Stein, Hawkins, and Parsons deprived Plaintiff Rothe-Kushel of his right to Journalism/Press as guaranteed by the First Amendment to the Constitution of the United States and secured against the States by way of the Fourteenth Amendment.

124. Defendants JCF, Hoopes, Rausch, Stein, Hawkins, and Parsons deprived Plaintiff Rothe-Kushel of his right to freedom of assembly as guaranteed by the First Amendment to the Constitution of the United States and secured against the States by way of the Fourteenth Amendment.

125. The actions of Defendants JCF, Hoopes, Rausch, Stein, Hawkins, and Parsons, were willful, wanton, reckless, and malicious, and, further, show a complete and deliberate

indifference to and conscious disregard for, the rights of Plaintiff Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

126. Defendants willfully and maliciously injured Plaintiff by deliberately depriving him of his recognized rights under the Constitution and laws of the United States.

127. Plaintiff is entitled to recover from Defendants reasonable attorneys fees and expenses as provided by 42 U.S.C. § 1988.

**COUNT II**
**FOURTH AMENDMENT WRONGFUL SEIZURE/ARREST**
**42 U.S.C. § 1983**
**(Against Parsons, Satter, and Curley)**

128. Plaintiff hereby incorporates by reference paragraphs 1 through 127 as if fully set forth here.

129. At all times relevant hereto, Defendants Parsons, Satter, and Curley acted or failed to act under color of state law.

130. A reasonable police officer would not have believed that Plaintiff Rothe-Kushel had committed an offense or that he had participated in an offense that was occurring and would not have believed that there was probable cause to arrest Plaintiff Rothe-Kushel.

131. A reasonable police officer would have recognized that Plaintiff Rothe-Kushel was lawfully exercising his First Amendment rights.

132. A reasonable police officer would have recognized that the KCPL and/or its representatives, agents, or employees would have been the appropriate complainant as to any charge against Plaintiff Rothe-Kushel for trespass.

35

133.  Additionally, a reasonable police officer would have known, or should have known that there was no probable cause to arrest Plaintiff Rothe-Kushel nor to have charged him with obstructing or resisting an officer or with trespass, charges as to which the prosecutor later filed an entry of *nolle prosequi*.

134.  Defendants knew or should have known that there is a clearly established prohibition against arrest without probable cause under the United States Constitution and that their actions violated Plaintiff Rothe-Kushel's rights under the Fourth Amendment.

135.  As alleged, as a result of the actions, omissions, conduct, and behavior of Defendants, Plaintiff Rothe-Kushel suffered damages as set forth, *supra* at ¶ 118.

136.  The acts, omissions, conduct, and behavior of Defendants were driven by evil motive or intent, or involved a reckless or callous indifference to or disregard of the constitutional rights of Plaintiff Rothe-Kushel by reason of which Rothe-Kushel is entitled to an award of punitive damages in an amount to be proved at trial but which is sufficient to punish Defendants and to deter Defendants and others similarly situated from like conduct in the future.

137.  Plaintiff Rothe-Kushel is entitled to recover from Defendants his reasonable attorneys' fees, expenses, and costs, as provided by 42 U.S.C. § 1988.

## COUNT III
### CONSPIRACY TO VIOLATE CIVIL RIGHTS
### 42 U.S.C. § 1983
### (Against Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF)

138.  Plaintiff hereby incorporates by reference paragraphs 1 through 137 as if fully set forth here.

139.  As alleged, *supra*, Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch,

and JCF, and/or other employees of the JCF, as a result of mutual understanding and a meeting of the minds as demonstrated in the allegations set forth above, determined that they were going to stop persons, including and in particular, Rothe-Kushel, from expressing their opinions, raising unpopular viewpoints, and questioning Ambassador Ross such that the First Amendment rights of persons including and in particular, Rothe-Kushel, to freedom of speech, assembly, and press/journalism and, if necessary to quell his expression, his Fourth Amendment right to be free from unlawful arrest and seizure would be violated.

140. Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF, together and under color of state law, reached a mutual understanding, acted in agreement, and engaged in a course of conduct to deprive Plaintiff Rothe-Kushel of his constitutional rights.

141. Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF, together and under color of state law, reached mutual understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive Plaintiff Rothe-Kushel of his constitutional rights, specifically, his right to freedom of speech, freedom of assembly, and freedom of the press/journalism, and, if necessary to quell his expression, his Fourth Amendment right to be free from unlawful arrest and seizure. The conspiracy violated Plaintiff Rothe-Kushel's rights under the First and Fourth Amendments to the United States Constitution and 42 U.S.C. § 1983.

142. That in furtherance of the conspiracy among Defendants, one or more of Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF, committed the following overt acts:

a. In her role as Executive Director of the JCF, Hoopes was deeply involved in

planning for the event from the outset.  She involved various members of the JCF Board of Trustees in planning for the event, including, but not limited to JCF Board of Trustees president Irvin Belzer, and sought their input.

b.  Hoopes got Hawkins involved on January 29, 2016, when she sent him her "Early Heads Up" email in which, *inter alia*, she requested that he remind her of security protocol for such events and to let her know how he would like to be kept in the loop.

c.  Hoopes further involved Hawkins on or about February 18, 2016, when she told him the event would be held at the KCPL Truman Forum Auditorium, provided more detail about what was planned for the event and again asked Hawkins to let her know what arrangements needed to be made and how much to budget for security.

d.  Hawkins involved Parsons in the planning for the security at the event by February 22, emailing him in late February to ask when they could go "check out the library".  He also emailed Hoopes that he was planning the advance visit with a KCPD officer (Parsons).

e.  Hawkins took Parsons along on February 24, 2016, for the advance site visit. Hawkins took Parsons along on the visit because Parsons "was his assistant" for the security at the event.  Parsons was Hawkins' "point of contact for the law enforcement agencies as the person who is going to coordinate the law enforcement officers as we all work for him and the [JCF]."

f.  In April, when it came to light that the KCPL was accepting RSVPs on its website, JCF and TLI became alarmed that they were not getting RSVP information and tried to get reassurances that they would get that information.

g.  Although the RSVP information was important to get a reliable count, Hawkins

38

wanted the list of attendees and requested it.

h. On April 26, 2016, Hoopes emailed Hawkins suggesting that they needed to have a "conversation" about the "chain of command" for security at the event.

i. Brooke Hardy of JCF said she would send Hawkins the RSVP information he had requested. On May 3, Bethany Rowell sent Judy Turner the list of attendees that included Rothe-Kushel's name. On information and belief, Hawkins received the RSVP information and used it to research potential attendees, including Rothe-Kushel.

j. On May 3, 2016, Hoopes convened a conference call for herself, Alex Burden, Hawkins, and another female. During the portion of the call devoted to security, they discussed, *inter alia*, how they would deal with protesters. Someone on the call told Hawkins that if there was a protester, he would remove that person. Hawkins told the others on the call that he would not remove anyone without direction. After some discussion about whether a protester would be "obvious", Hawkins reiterated that he needed direction to be able to remove someone. During the call, an arrangement was made for the protester to be pointed out and Hawkins would be pointed out and that would be a signal to remove the protester and then the female voice interjected, "or the microphone will be shut off." Parsons knew that there was an arrangement to turn off the microphone if a person became combative.

k. On May 4, Hoopes confirmed to Belzer that Hawkins had coordinated with the KCPD, *i.e.*, Parsons, who, in turn, had enlisted Satter and Curley.

l. Hawkins "called the shots" on the night of the event and Parsons, Satter, and Curley took cues from him.

m.  While Rothe-Kushel and McCarron were outside, Hawkins photographed Rothe-Kushel and sent the photograph to other members of the security team, *i.e.*, Parsons, Satter, and Curley.

n.  Hawkins alerted Satter to two males (Rothe-Kushel and McCarron) sitting outside the library entrance and advised they were possible protestors.

o.  Hawkins requested that Rothe-Kushel and the attaché case and bottle he was carrying be searched or possible contraband should they enter.  Satter conducted that search. Satter believed that Hawkins had "intelligence" on Rothe-Kushel because Hawkins somehow knew who he was.

p.  Hawkins gave Parsons, Satter, and Curley radios so they could be in contact with each other during the event.

q.  Just before the Q-and-A session began, Leslie Case was approached by two individuals, one of whom was from the JCF, and, on information and belief was Defendant Stein, and again, on information and belief, Defendant Stein told her that he was going to be in a particular location in the auditorium and that if he gave her a signal he needed her to cut off the microphone.

r.  Also before the Q-and-A, Kim Rausch also approached Case and said she was going to be monitoring the microphone on the opposite side.

s.  In the middle of Rothe-Kushel's initial question, Rausch raised her hand while looking at Case to signal that Case should cut off the microphone.

t.  Hawkins advised Parsons, Satter, and Curley that someone needed to be removed over the radios that he had provided them.

40

u.  Hawkins and Parsons removed Rothe-Kushel from the auditorium while he was speaking.

v.  Hawkins authorized a complaint for trespass, and Parsons had and used the ultimate authority as to whether to write a charge for trespass.

143.  Defendants' overt acts violated Plaintiff Rothe-Kushel's constitutionally protected rights and injured Rothe-Kushel in that he was removed from the public forum, his speech was halted, he was battered, he was wrongfully arrested, taken to jail, required to post bond/bail, and in order to defend charges against him, had to hire defense counsel.

144.  Plaintiff Rothe-Kushel was actually deprived of his constitutional rights under the First Amendment, *i.e.*, freedom of speech, assembly, and or press/journalism, and/or was actually deprived of his Fourth Amendment right to be free from unlawful seizure and arrest.

145.  Plaintiff suffered damages as set forth, *supra* at ¶ 118, as a direct and proximate result of Defendants' conspiracy to deprive him of his First and Fourth Amendment rights. For his damages, Plaintiff is entitled to monetary relief.

146.  Defendants' actions were deliberate, reckless, wanton, cruel, and were engaged in with evil motive or reckless disregard for Plaintiff Rothe-Kushel's constitutional rights, thereby entitling Rothe-Kushel to punitive damages.

147.   Rothe-Kushel is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

## COUNT IV
### FAILURE TO TRAIN/INADEQUATE TRAINING
### 42 U.S.C. § 1983
### (Against Defendant Chief Smith and Defendant Commissioners)

148.  Plaintiff hereby incorporates by reference paragraphs 1 through 147 as if fully

set forth here.

149. Defendant Chief Smith and, as the Board, Defendant Commissioners Shurin, Garrett, Tolbert, Wagner, and James, had the authority to train, supervise, discipline, and otherwise control the officers of the Kansas City, Missouri Police Department, including Defendants Parsons, Satter, and Curley.

150. Defendants Smith, Shurin, Garrett, Tolbert, Wagner, and James had a duty to train police under their supervision, including Defendants Parsons, Satter, and Curley.

151. Defendant Smith and Defendant Commissioners had a duty to provide reasonable training and adequate training to prevent the police officers under their supervision from:

   a. unlawfully violating Rothe-Kushel's First Amendment right to freedom of speech, press/journalism; and assembly;

   b. unlawfully arresting Rothe-Kushel in violation of his Fourth Amendment right to be free from unlawful seizure and arrest;

   c. unlawfully conspiring (under federal and state law) to violate Rothe-Kushel's civil rights

   d. subjecting Rothe-Kushel to a battery; and,

   e. falsely arresting Rothe-Kushel.

152. Defendant Smith and Defendant Commissioners failed to train or inadequately trained the police officers under their supervision in a manner that reasonable police chiefs and police commissioners would have under the circumstances.

153. The failure of Defendant Smith and Defendant Commissioners to provide

42

reasonable and adequate training to prevent the police officers under their supervision from:

a.  unlawfully violating Rothe-Kushel's First Amendment right to freedom of speech, press/journalism; and assembly; and

b.  unlawfully arresting Rothe-Kushel in violation of his Fourth Amendment right to be free from unlawful seizure and arrest;

c.  unlawfully conspiring (under federal and state law) to violate Rothe-Kushel's civil rights;

d.  subjecting Rothe-Kushel to a battery; and,

e.  falsely arresting Rothe-Kushel

amounts to a custom and demonstrated deliberate indifference to or tacit authorization of the acts and omissions of Defendants Parsons, Satter, and Curley.

154.  The failure of Defendant Smith and Defendant Commissioners to adequately train KCPD officers, and particularly Defendants Parsons, Satter, and Curley, proximately caused injury to Rothe-Kushel.

155.  Rothe-Kushel has been damaged as a direct and proximate result of the defendants' actions and failure to act.  In particular, he has suffered injuries as set forth, *supra* at paragraph 118.

156.  The failure of Defendant Chief Smith and Defendant Commissioners to exercise reasonable care in training the police officers under their supervision, including Defendants Parsons, Satter, and Curley, was willful, wanton, reckless, and malicious, and further, shows a complete and deliberate indifference to, and conscious disregard for, the rights of Rothe-Kushel.  Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages

43

against Defendants in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

157.  Rothe-Kushel is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

**COUNT V**
**FAILURE TO SUPERVISE/INADEQUATE SUPERVISION**
**42 U.S.C. § 1983**
**(Against Defendant Chief Smith and Defendant Commissioners)**

158.  Plaintiff hereby incorporates by reference paragraphs 1 through 157 as if fully set forth here.

159.  Defendant Chief Smith and, as the Board, Defendant Commissioners Shurin, Garrett, Tolbert, Wagner, and James, had the authority to train, supervise, discipline, and otherwise control the officers of the Kansas City, Missouri Police Department, including Defendants Parsons, Satter, and Curley.

160.  Defendant Chief Smith and Defendant Commissioners had a duty to control, direct, and supervise the conduct of Defendants Parsons, Satter, and Curley.

161.  Defendant Chief Smith and Defendant Commissioners had a duty to exercise reasonable care to prevent the officers under their supervision from:

a.  unlawfully violating Rothe-Kushel's First Amendment right to freedom of speech, press/journalism; and assembly;

b.  unlawfully arresting Rothe-Kushel in violation of his Fourth Amendment right to be free from unlawful seizure and arrest;

c.  unlawfully conspiring (under federal and state law) to violate Rothe-Kushel's civil rights;

44

d.  subjecting Rothe-Kushel to a battery; and,

e.  falsely arresting Rothe-Kushel.

162.  Defendant Chief Smith and Defendant Commissioners failed to exercise the proper degree of control and supervision of the officers under their supervision that reasonable governmental entities, police departments, police chiefs, and governmental officials would have exercised under the circumstances.

163.  The failure of Defendant Chief Smith and Defendant Commissioners to provide reasonable and adequate supervision to prevent the police officers under their supervision from:

a.  unlawfully violating Rothe-Kushel's First Amendment right to freedom of speech, press/journalism; and assembly;

b.  unlawfully arresting Rothe-Kushel in violation of his Fourth Amendment right to be free from unlawful seizure and arrest;

c.  unlawfully conspiring (under federal and state law) to violate Rothe-Kushel's civil rights;

d.  subjecting Rothe-Kushel to a battery; and,

e.  falsely arresting Rothe-Kushel

amounts to a custom and demonstrated deliberate indifference to or tacit authorization of the acts and omissions of Defendants Parsons, Satter, and Curley.

164.  The failure of Defendant Chief Smith and Defendant Commissioners to provide reasonable supervision of Defendants Parsons, Satter, and Curley proximately caused injury to Rothe-Kushel.

45

165. Rothe-Kushel has been damaged as a direct and proximate result of the defendants' actions and failures to act. In particular, Rothe-Kushel has suffered injuries as set forth, *supra* at paragraph 118.

166. The failure of Defendant Chief Smith and Defendant Commissioners to exercise reasonable care in supervising the police officers under their supervision, including Defendants Parsons, Satter, and Curley, was willful, wanton, reckless, and malicious, and further, shows a complete and deliberate indifference to, and conscious disregard for, the rights of Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages against Defendants in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

167. Rothe-Kushel is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

## COUNT VI
### STATE LAW BATTERY
### (Against Hawkins and Parsons)

168. Plaintiff hereby incorporates by reference paragraphs 1 through 167 as if fully set forth here.

169. Defendants Hawkins and Parsons intentionally grabbed and shoved Plaintiff Rothe-Kushel as alleged, *supra* at ¶¶ 108-112.

170. Defendants Hawkins and Parsons thereby caused a contact with Plaintiff Rothe-Kushel which was offensive to Plaintiff.

171. The contact that Defendants Hawkins and Parsons caused with Plaintiff Rothe-Kushel would be offensive to a reasonable person.

46

172. When Defendants Hawkins and Parsons grabbed Rothe-Kushel he/they caused Rothe-Kushel bodily harm in that the force with which he/they grabbed Rothe-Kushel caused bruising to Rothe-Kushel's arm thereby causing Rothe-Kushel to sustain damages as set forth, *supra* at paragraph 118.

173. The conduct of Defendants Hawkins and Parsons in battering Rothe-Kushel was willful, wanton, reckless, and malicious, and was outrageous because of their evil motive or reckless indifference to, and conscious disregard for the rights of Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

### COUNT VII
### STATE LAW FALSE ARREST
### (Against Defendants Parsons, Curley, Hawkins, Hoopes, and Jewish Community Foundation)

174. Plaintiff hereby incorporates by reference paragraphs 1 through 173 as if fully set forth here.

175. Defendants willfully and unlawfully and under color of legal authority restrained and arrested Plaintiff Rothe-Kushel against his will and/or instigated, caused, or procured the restraint and arrest of Rothe-Kushel against his will.

176. The restraint and arrest of Rothe-Kushel against his will was unlawful.

177. The unlawful restraint and arrest of Rothe-Kushel caused him to suffer damages as set forth, *supra* at paragraph 118.

178. The conduct of Defendants Parsons, Curley, Hawkins, Hoopes, and the Jewish Community Foundation in falsely arresting or causing the false arrest of Rothe-Kushel was

47

willful, wanton, reckless, and malicious, and was outrageous because of their evil motive or reckless indifference to, and conscious disregard for the rights of Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants Parsons, Curley, Hawkins, Hoopes, and the Jewish Community Foundation or to deter them and others from like conduct in the future.

## COUNT VIII
### STATE LAW CONSPIRACY
**(Against Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF)**

179. Plaintiff hereby incorporates by reference paragraphs 1 through 178 as if fully set forth here.

180. Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF, and/or other employees of the JCF, as a result of mutual understanding and a meeting of the minds as demonstrated in the allegations set forth above, determined that they were going to stop persons, including and in particular, Rothe-Kushel, from expressing their opinions, raising unpopular viewpoints, and posing uncomfortable questions to Ambassador Ross and agreed to intervene if someone engaged in such conduct or there was a protester.

181. Defendants sought to accomplish the goal of stopping persons, including and in particular, Rothe-Kushel, from expressing their opinions, raising unpopular viewpoints, and posing uncomfortable questions to Ambassador Ross and agreed to intervene if someone engaged in such conduct or there was a protester even if it violated the First Amendment or Fourth Amendment rights of the person or persons they deemed needed to be stopped and removed.

182. Defendants agreed that the goal was to stop persons from expressing their

opinions, raising unpopular viewpoints and posing uncomfortable questions to Ambassador Ross and agreed that the goal would be accomplished by persons from the JCF, on information and belief, Defendant Stein, and/or Kim Rausch of TLI signaling that the persons needed to be removed, whereupon the microphone was to be muted and the person removed from the auditorium.

183.  The following overt acts were performed by Defendants in furtherance of their conspiracy:

a.  In her role as Executive Director of the JCF, Hoopes was deeply involved in planning for the event from the outset.  She involved various members of the JCF Board of Trustees in planning for the event, including, but not limited to JCF Board of Trustees president Irvin Belzer, and sought their input.

b.  Hoopes got Hawkins involved on January 29, 2016, when she sent him her "Early Heads Up" email in which, *inter alia*, she requested that he remind her of security protocol for such events and to let her know how he would like to be kept in the loop.

c.  Hoopes further involved Hawkins on or about February 18, 2016, when she told him the event would be held at the KCPL Truman Forum Auditorium, provided more detail about what was planned for the event and again asked Hawkins to let her know what arrangements needed to be made and how much to budget for security.

d.  Hawkins involved Parsons in the planning for the security at the event by February 22, emailing him in late February to ask when they could go "check out the library".  He also emailed Hoopes that he was planning the advance visit with a KCPD officer (Parsons).

e.  Hawkins took Parsons along on February 24, 2016, for the advance site visit.

49

Hawkins took Parsons along on the visit because Parsons "was his assistant" for the security at the event. Parsons was Hawkins' "point of contact for the law enforcement agencies as the person who is going to coordinate the law enforcement officers as we all work for him and the [JCF]."

f. In April, when it came to light that the KCPL was accepting RSVPs on its website, JCF and TLI became alarmed that they were not getting RSVP information and tried to get reassurances that they would get that information.

g. Although the RSVP information was important to get a reliable count, Hawkins wanted the list of attendees and requested it.

h. On April 26, 2016, Hoopes emailed Hawkins suggesting that they needed to have a "conversation" about the "chain of command" for security at the event.

i. Brooke Hardy of JCF sent Hawkins the RSVP information he had requested. On May 3, Bethany Rowell sent Judy Turner the list of attendees that included Rothe-Kushel's name. On information and belief, Hawkins used the RSVP information to research potential attendees, including Rothe-Kushel.

j. On May 3, 2016, Hoopes convened a conference call for herself, Alex Burden, Hawkins, and another female. During the portion of the call devoted to security, they discussed, *inter alia*, how they would deal with protesters. Someone on the call told Hawkins that if there was a protester, he would remove that person. Hawkins told the others on the call that he would not remove anyone without direction. After some discussion about whether a protester would be "obvious", Hawkins reiterated that he needed direction to be able to remove someone. During the call, an arrangement was made for the protester to be

50

pointed out and Hawkins would be pointed out and that would be a signal to remove the protester and then the female voice interjected, "or the microphone will be shut off." Parsons knew that there was an arrangement to turn off the microphone if a person became combative.

k. On May 4, Hoopes confirmed to Belzer that Hawkins had coordinated with the KCPD, *i.e.*, Parsons, who, in turn, had enlisted Satter and Curley.

l. Hawkins "called the shots" on the night of the event and Parsons, Satter, and Curley took cues from him.

m. While Rothe-Kushel and McCarron were outside, Hawkins photographed Rothe-Kushel and sent the photograph to other members of the security team, *i.e.*, Parsons, Satter, and Curley.

n. Hawkins alerted Satter to two males (Rothe-Kushel and McCarron) sitting outside the library entrance and advised they were possible protestors.

o. Hawkins requested that Rothe-Kushel and the bag and bottle he was carrying be searched or possible contraband should they enter. Satter conducted that search. Satter believed that Hawkins had "intelligence" on Rothe-Kushel because Hawkins somehow knew who he was.

p. Hawkins gave Parsons, Satter, and Curley radios so they could be in contact with each other during the event.

q. Just before the Q-and-A session began, Leslie Case was approached by two individuals, one of whom was from the JCF, and, on information and belief was Defendant Stein, and again, on information and belief, Defendant Stein told her that he was going to be

in a particular location in the auditorium and that if he gave her a signal he needed her to cut off the microphone.

      r.  Also before the Q-and-A, Kim Rausch also approached Case and said she was going to be monitoring the microphone on the opposite side.

      s.  In the middle of Rothe-Kushel's initial question, Rausch raised her hand while looking at Case to signal that Case should cut off the microphone.

      t.  Hawkins advised Parsons, Satter, and Curley that someone needed to be removed over the radios that he had provided them.

      u.  Hawkins and Parsons removed Rothe-Kushel from the auditorium while he was speaking.

      v.  Hawkins authorized a complaint for trespass, and Parsons had and used the ultimate authority as to whether to write a charge for trespass.

      184.  Defendants' conspiracy caused Rothe-Kushel to sustain damages in that he was removed from the public forum, his speech was halted, he was battered (and bruised), he was wrongfully arrested, taken to jail, required to post bond/bail, and in order to defend charges against him, had to hire defense counsel. He was deprived of his constitutional rights under the First Amendment, *i.e.*, freedom of speech, assembly, and or press/journalism and/or was actually deprived of his Fourth Amendment right to be free from unlawful seizure and arrest.

      185.  The conduct of Defendants Hoopes, Stein, Hawkins, Parsons, Satter, Rausch, and JCF in conspiring against Rothe-Kushel was willful, wanton, reckless, and malicious, and was outrageous because of their evil motive or reckless indifference to, and conscious disregard for the rights of Rothe-Kushel. Therefore, Rothe-Kushel is entitled to an award of

52

punitive or exemplary damages in an amount sufficient to punish Defendants or to deter

Defendants and others from like conduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court, after a trial by jury of his claims

enter judgment against Defendants for his actual and compensatory or nominal damages and

punitive or exemplary damages as are proven at trial, for his attorney fees and expenses

pursuant to 42 U.S.C. § 1988, for costs herein incurred, and for any such further legal and

equitable relief as the Court deems appropriate.

Respectfully submitted,

ARTHUR BENSON & ASSOCIATES

By  s/ Arthur A. Benson II

By  s/ Jamie Kathryn Lansford
Arthur A. Benson II #21107
Jamie Kathryn Lansford #31133
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
abenson@bensonlaw.com
jlansford@bensonlaw.com

and

LAW OFFICE OF FRED SLOUGH

By  s/ Fred L. Slough
Fred L. Slough  #23915
2800 City Center Square, 1100 Main Street
Kansas City, Missouri  64105

53

(816) 309-2644
(816) 472-6009
fred@fredslough.com

Attorneys for Plaintiff Rothe-Kushel