IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JEREMY ROTHE-KUSHEL,                    )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )    Case No.  4:18-cv-319-BP
                                         )
JEWISH COMMUNITY FOUNDATION              )
OF GREATER KANSAS CITY, et al.,          )
                                         )
                    Defendants.          )

**RESPONSE IN OPPOSITION TO
DEFENDANT PARSONS' MOTION FOR SUMMARY JUDGMENT**

LAW OFFICE OF ARTHUR BENSON II

Arthur A. Benson II #21107
Jamie Kathryn Lansford #31133
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
abenson@bensonlaw.com
jlansford@bensonlaw.com

and

LAW OFFICE OF FRED SLOUGH

Fred L. Slough   Mo. Bar No. 23915
2800 City Center Square, 1100 Main Street
Kansas City, Missouri  64105
(816) 309-2644
(816) 472-6009 (telefacsimile)
fred@fredslough.com

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONCISE LISTING OF GENUINE ISSUES OF MATERIAL FACT . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE OF THE MATTER BEFORE THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PLAINTIFF'S RESPONSES TO DEFENDANTS PARSONS AND CURLEY'S STATEMENT OF
UNCONTROVERTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PLAINTIFF'S RESPONSES TO DEFENDANT SMITH AND DEFENDANT COMMISSIONERS'
STATEMENT OF UNCONTROVERTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

I. THE COURT MUST CONSIDER THE FACTS IN THE LIGHT MOST FAVORABLE TO
     PLAINTIFF AND GIVE HIM THE BENEFIT OF REASONABLE INFERENCES. . . . . . . . . . . . . . . . 44

II. DEFENDANT PARSONS IS NOT ENTITLED TO QUALIFIED IMMUNITY
     BECAUSE HE VIOLATED ROTHE-KUSHEL'S CLEARLY ESTABLISHED RIGHTS. . . . . . . . . . . . 46

     A. Plaintiff's First Amendment rights were violated. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

          1. Interrupting Rothe-Kushel's speech violated his First Amendment rights. . . . . . . 46

          2. Even if there was probable cause to arrest Rothe-Kushel, his First
              Amendment rights were violated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     B. Rothe-Kushel's Fourth Amendment rights were violated. . . . . . . . . . . . . . . . . . . . . 51

Case 4:18-cv-00319-BP   Document 232   Filed 12/23/19   Page 2 of 66

C. Rothe-Kushel's First and Fourth Amendment rights were clearly established.  . . . . . 51

   1. The First Amendment right was clearly established.  . . . . . . . . . . . . . . . . . . . . . . . 51

   2. The Fourth Amendment right was clearly established.  . . . . . . . . . . . . . . . . . . . . . 52

III. PARSONS FALSELY ARRESTED ROTHE-KUSHEL.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

   A. There was no probable cause for arresting for arresting for trespass, for resistance or obstruction, nor for disorderly conduct or breach of the peace..  . . . . . . . . . . . . . . . . 53

   B. Parsons acted with reckless disregard of Rothe-Kushel's rights or with bias or bad faith animus toward Rothe-Kushel so is not entitled to official immunity.  . . . 56

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## TABLE OF EXHIBITS

PLAINTIFF'S EXHIBIT 1        Woolfolk Trial Transcript

PLAINTIFF'S EXHIBIT 2        Brooke Hardy Deposition

PLAINTIFF'S EXHIBIT 3        Alex Burden Deposition

PLAINTIFF'S EXHIBIT 4        Brochure Describing Inaugural Truman and Israel Lecture

PLAINTIFF'S EXHIBIT 5        JCF Rule 30(b)(6) Deposition

PLAINTIFF'S EXHIBIT 6        Hoopes-Hawkins Email, January 29, 2016

PLAINTIFF'S EXHIBIT 7        Flyer Advertising Event

PLAINTIFF'S EXHIBIT 8        Bayer-Hardy Email with News Release, April 7, 2016

PLAINTIFF'S EXHIBIT 9        Bethany Rowell Deposition

PLAINTIFF'S EXHIBIT 10       KCPL Rule 30(b)(6) Deposition

PLAINTIFF'S EXHIBIT 11       Carrie Coogan Deposition

PLAINTIFF'S EXHIBIT 12       Vicki Patterson Deposition

PLAINTIFF'S EXHIBIT 13       Leslie Case Deposition

PLAINTIFF'S EXHIBIT 14       Sgt. Michael Satter Deposition

PLAINTIFF'S EXHIBIT 15       Lauren Hoopes Deposition

PLAINTIFF'S EXHIBIT 16       Kim Rausch Deposition

PLAINTIFF'S EXHIBIT 17       Joshua Stein Deposition

PLAINTIFF'S EXHIBIT 18       Satter Incident Report

PLAINTIFF'S EXHIBIT 19       Leslie Case Statement

PLAINTIFF'S EXHIBIT 20       Truman and Israel Dual Video/Audio

PLAINTIFF'S EXHIBIT 21       Trespass Ticket Issued to Rothe-Kushel

PLAINTIFF'S EXHIBIT 22       Steven Woolfolk Deposition

PLAINTIFF'S EXHIBIT 23          Parsons Incident Report

PLAINTIFF'S EXHIBIT 24          Parsons' Emails Regarding Rothe-Kushel

PLAINTIFF'S EXHIBIT 25          Parsons' Bias Code Emails

PLAINTIFF'S EXHIBIT 26          Jason Asper Deposition

PLAINTIFF'S EXHIBIT 27          Parsons' "Activist to Know" Email

PLAINTIFF'S EXHIBIT 28          Sgt. Robert Wynne Deposition

PLAINTIFF'S EXHIBIT 29          Parsons' October 6, 2016 Email attaching comments on article

PLAINTIFF'S EXHIBIT 30          Parsons-Satter emails regarding Parsons' original narrative

PLAINTIFF'S EXHIBIT 31          Curley Deposition Excerpts, Woolfolk Litigation

PLAINTIFF'S EXHIBIT 32          Woolfolk Deposition Excerpts, Woolfolk Litigation

PLAINTIFF'S EXHIBIT 33          Photographs of Rothe-Kushel's arm

# TABLE OF AUTHORITIES

CASES

*Anderson v. Creighton*, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Bigford v. Taylor*, 834 F.2d 1213 (5th Cir.),
    *cert. denied*, 488 U.S. 822 (1988); 488 U.S. 851 (1988) . . . . . . . . . . . . . . . . . . . . . . . 52

*Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466 (Mo. App. 2005) . . . . . . . . . . . . . . . . 56

*Boos v. Barry*, 485 U.S. 312 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Brosseau v. Haugen*, 543 U.S. 194 (2004) (*per curiam*) . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Brown v. Louisiana*, 383 U.S. 131 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*City of Kansas City v. Carlson*, 292 S.W.3rd 368 (Mo. App. 2009) . . . . . . . . . . . . . . . . . . . 53

*City of Kansas City, Missouri v. Thorpe*, 499 S.W.2d 454 (Mo. 1973) . . . . . . . . . . . . . . . . . 55

*City of Raymore v. O'Malley*, 527 S.W.3d 857 (Mo. App 2017) . . . . . . . . . . . . . . . . . . . . . . 55

*City of St. Louis v. Slupsky*, 162 S.W. 155 (Mo. 1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Cohen v. California*, 403 U.S. 15 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788 (1985) . . . . . . . 46-47

*Crawford-El v. Britton*, 523 U. S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123 (1992) . . . . . . . . . . . . 47, 56

*Frye v. Kansas City Police Dep't*, 375 F.3d 785 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 47

*Gooding v. Wilson*, 405 U.S. 518 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Habiger v. City of Fargo*, 80 F.3d 289 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996) . . . . . . 52

Case 4:18-cv-00319-BP   Document 232   Filed 12/23/19   Page 6 of 66

*Hartman v. Moore*, 547 U.S. 250 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Hope v. Pelzer*, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Hunter v. Bryant*, 502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Kansas City v. Graham*, 502 S.W.2d 411 (Mo. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Kansas City v. Pigerre*, 625 S.W.2d 938 (Mo. App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-56

*Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U. S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 51

*Pearson v. Callahan*, 555 U.S. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*,
391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*St. Louis County v. Stone*, 776 S.W.2d 885 (Mo. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 53

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Scott v. Harris*, 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183 (3d Cir. 2008) . . . . . . . . . 46-47

*State v. Belton*, 108 S.W.3d 171 (Mo. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*State v. Caldwell*, 352 S.W.3d 378 (Mo. App. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443 (Mo. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 56

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51

*Tolan v. Cotton*, 572 U.S. 650 (2014) (*per curiam*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

*Texas v. Johnson*, 491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Washington*, 109 F.3d 459 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51

*White v. McKinley*, 519 F.3d 806 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Williams v. City of Alexander, Ark.*, 772 F.3d 1307 (8th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 52

**STATUTES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

MO. REV. STAT. § 569.140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

MO. REV. STAT. § 575.150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 54

**RULES**

FED. R. CIV. P. 56 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

**OTHER AUTHORITIES**

75 AM. JUR. 2D *Trespass* § 41 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

RESTATEMENT (SECOND) OF TORTS §§ 168, 181 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JEREMY ROTHE-KUSHEL,           )
                               )
                Plaintiff,     )
                               )
v.                             )     Case No.  4:18-cv-319-BP
                               )
JEWISH COMMUNITY FOUNDATION    )
OF GREATER KANSAS CITY, et al.,  )
                               )
                Defendants.    )


**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT PARSONS' MOTION FOR SUMMARY JUDGMENT**

Defendant Detective Brent Parsons has moved for summary judgment[1] but as this

Response demonstrates, his motion must be denied.


### CONCISE LISTING OF GENUINE ISSUES OF MATERIAL FACT

The following are genuine issues of material fact:

1.  Whether the acts of Defendant Parsons interfered with or denied Plaintiff of First

Amendment rights.

2.  Whether Plaintiff was seized for Fourth Amendment Purposes.

3.  Whether Plaintiff engaged in conduct that violated Kansas City ordinances.

---

[1]There were originally three motions for summary judgment, *i.e.*, Defendants Parsons and
Curley's, Docs. 224 - 225-8; the Chief of Police and the Board's, Docs. 222 - 223-7; and, the
Jewish Community Foundation's, Docs. 226 - 227-15.  The only motion remaining to be
resolved by the Court relates solely to Defendant Parsons.

## NATURE OF THE MATTER BEFORE THE COURT

On May 9, 2016, while attending the public portion of the inaugural Truman and Israel Lecture in the Truman Forum Auditorium located inside the Plaza Branch of the Kansas City Public Library, Plaintiff Rothe-Kushel was removed from a public forum while participating in the question-and-answer session, *i.e.*, engaging in free speech, assembly and press/journalism, and was subsequently arrested. Rothe-Kushel alleges claims under 42 U.S.C. § 1983 of deprivation of First Amendment freedoms of Speech, Journalism/Press, and Assembly and deprivation of his Fourth Amendment right to be free from wrongful seizure/arrest. He also raises state law claims of battery and false arrest. Pending before the Court is Parsons' motion for summary judgment. As this response in opposition demonstrates, the motion must be denied.

## PLAINTIFF'S RESPONSES TO DEFENDANTS PARSONS AND CURLEY'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS[2]

1. Brent Parsons was employed by the Kansas City, Missouri Police Department from 1996 to 2018.

Uncontroverted.

2. On May 9, 2016, Det. Parsons was a detective assigned to the Kansas City Terrorism and Early Warning Center of the KCPD.

Uncontroverted.

---

[2] Paragraphs contained in the Parsons-Curley Statement of Uncontroverted Facts are cited herein as "PCSF". Responses to the Parsons-Curley Facts are cited as "RPCSF". Similarly, paragraphs contained in the Smith-Board Statement of Uncontroverted Facts are cited as "SBSF" and responses thereto are cited as "RSBSF". Paragraphs contained in Rothe-Kushel's Statement of Uncontroverted Facts are cited as "PSF". Additionally, references to exhibits submitted in support of the Parsons-Curley motion are cited as "PC's Ex.", references to exhibits submitted in support of the Smith-Board motion are cited as "SB's Ex.", and references to exhibits submitted in support of the Jewish Community Foundation's motion are cited as "JCF's Ex.".

3. Michael Curley is employed by the Kansas City, Missouri Police Department, and has been since 1997.

Uncontroverted.

4. On May 9, 2016, Det. Curley was a detective assigned to the Internal Affairs Unit of the KCPD.

Uncontroverted.

5. Det. Parsons and Det. Curley went through the Kansas City, Missouri Police Academy.

Uncontroverted.

6. In 2016, Blair Hawkins was head of security for the entire Jewish community in the Kansas City area.

Uncontroverted. In 2016, Blair Hawkins was director of security for the Jewish Community (proper noun) in the Kansas City area which is a consortium of agencies. Hawkins did not have any contractual obligations to Jewish people or Jewish organizations who would consider themselves part of the Jewish community in the Kansas City area but were not members of the organizations incorporated as the "Jewish Community." PC's Ex. F, Hawkins Dep. 8:24-9:21.

7. Mr. Hawkins asked Det. Parsons whether he wanted to work an off-duty job for the Jewish Community Foundation, at a speaker program, involving a former ambassador to Israel.

Uncontroverted.

8. Mr. Hawkins secured the off-duty officers through Parsons to work the event.

Uncontroverted.

9. The event was scheduled for May 9, 2016, at the Kansas City Public Library-Plaza

3

branch.

Uncontroverted.

10. On May 9, 2016, Det. Parsons, Det. Curley, and Sgt. Michael Satter worked the event.

Uncontroverted.

11. Det. Parsons was never told of any plan to silence disagreeable speakers.

Controverted. While Parsons was never told of any plan to "silence disagreeable speakers", the tenor of the statement is controverted because Hawkins participated in a meeting between JCF and TLI in which the cut-the-mic plan for removal of "protesters" was discussed and Hawkins subsequently shared that plan with Detective Parsons. Further, before the Ross speech, Hawkins pointed out Rothe-Kushel to Parsons as a possible "protestor". PC's Ex. A, Parsons Dep at 144:13-145:3; *see also*, PSF ¶¶ 3-12, 98; Pf's Ex. 1, Woolfolk Trial Transcript at 10:16-12:9; 125:9-126:5.

12. Det. Parsons never spoke with anyone at the Jewish Community Foundation other than Mr. Hawkins.

Uncontroverted.

13. Det. Parsons believed that Mr. Hawkins was the appointed authority at the event.

Uncontroverted, but immaterial.

14. Jeremy Rothe-Kushel attended the event on May 9, 2016.

Uncontroverted.

15. After the speaker ended his lecture, he took questions from the audience.

Uncontroverted.

16. Rothe-Kushel asked a question of the speaker following the presentation.

4

Uncontroverted.

17. Rothe-Kushel made his statement without interference.

Controverted. The best evidence of the nature and content of Plaintiff's remarks and exchange with Ambassador Ross are JCF's Ex. 2, an excerpt from KCPL's Video/Audio and Pf's Ex. 20, the Dual Video. *See also* PSF ¶ 76.

18. The speaker responded.

Uncontroverted.

19. Rothe-Kushel interrupted the speaker's response.

Controverted. Rothe-Kushel did not interrupt or talk over Ross while Ross was speaking. Rothe-Kushel responded briefly and conversationally when Ross completed phrases. JCF's Ex. 2, KCPL Video; Pf's Ex. 20, Dual Video. *See also* PSF ¶ 85.

20. The speaker responded again, concluding the discussion.

Controverted. The speaker's response did not conclude the discussion. *See* PSF ¶¶ 84, 85.

21. It sounded to Det. Parsons like Rothe-Kushel raised his voice and tone in addressing the speaker.

Controverted. Detective Parsons testified that he moved towards Rothe-Kushel because of "his raised voice over the dead [mic] and it may have been about the same time he was yelling 'Take your hands off me.'" And, according to Parsons, the Ambassador had ended the conversation before the mic was cut off. PC's Ex. A, Parsons Dep. at 156:1-6. The last word the speaker said was "so" and he shrugged. Parsons knew that "Take your hands off me" was not directed at the speaker. PC's Ex. A, Parsons Dep. at 156:1-11; JCF's Ex. 2, KCPL Video at approximately 3:25 to 4:00. *See* PSF ¶¶ 65, 76, 81-83.

5

22. A staff member of the public library turned off Rothe-Kushel's microphone. Uncontroverted.

23. Rothe-Kushel was then told he was done and needed to leave by head of security Blair Hawkins.

Controverted. Rothe-Kushel was told without explanation by Hawkins, "You're done," while speaking to the Ambassador but he was not told to leave. He was instead physically grabbed and pushed away from the microphone. *See* PSF ¶¶ 86-88. *See also* Pf's Ex. 33, Photographs of Rothe-Kushel's arm.

24. Rothe-Kushel began yelling at Mr. Hawkins to take his hands off of him, causing a disturbance.

Controverted. Hawkins' grabbing of Rothe-Kushel surprised Rothe-Kushel who told Hawkins to take his hands off him and that he would leave if asked. PC's Ex. G, Rothe-Kushel Dep at 303:13-304:16. *See also* PSF ¶ 90.

25. Mr. Hawkins attempted to physically remove Rothe-Kushel, but Rothe-Kushel began to actively resist.

Controverted in part. Hawkins removed Rothe-Kushel who was in mid-sentence. When Hawkins, who was not a law enforcement officer, unexpectedly grabbed Rothe-Kushel from behind, Rothe-Kushel initially spontaneously reacted by attempting to pull away and by asking that hands be removed from him, that he would leave if asked. PC's Ex. G, Rothe-Kushel Dep. at 115:18-116:25; 119:5-121:12; Pf's Ex. 1, Woolfolk Trial Transcript at 205:8-17. *See also* PSF ¶ 90.

26. Rothe-Kushel continued yelling at Hawkins to take his hands off of him and that he would leave if he was asked.

6

Controverted in part. Rothe-Kushel was not yelling at Hawkins but was speaking loudly to be heard. After Hawkins and Parsons let go of him and the situation de-escalated, Rothe-Kushel stopped speaking, walked back to where he had been sitting, picked up his bag, and on his own accord, along with his companion, Greg McCarron, followed Woolfolk out of the auditorium side door. Pf's Ex. 1, Woolfolk Trial Transcript at 205:8-17; 207:5-15; JCF's Ex. 2, KCPL Video from approximately 3:25 to 4:00.

27. Rothe-Kushel did not attempt to leave the auditorium.

Controverted. Rothe-Kushel stated his intention to leave, but was hindered from leaving by Hawkins and Parsons grabbing and pushing him. Rothe-Kushel began walking out, leading the group toward his seat, as soon as Hawkins and Parsons let go of him. Rothe-Kushel walked directly to go get his bag and then he followed Woolfolk out of the auditorium on his own accord. Pf's Ex. 1, Woolfolk Trial Transcript at 123:11-124:6; 179:11-21; 207:5-15; Pf's Ex. 20, Truman and Israel Dual Video/Audio[3] from 2:25 to 3:14.

28. To Det. Parsons, it appeared people were upset, yelling, and acting outwardly in anger at Rothe-Kushel.

Controverted. A few members of the audience expressed disagreement with the ideas Rothe-Kushel expressed but the robust exchange of views did not cause any "acts" of anger. *See* PSF ¶ 63.

29. Det. Parsons attempted to assist Mr. Hawkins in escorting Rothe-Kushel from the auditorium.

Uncontroverted.

30. Det. Parsons also told Rothe-Kushel he needed to leave.

[3]Hereinafter, "Dual Video".

7

Controverted in part in that neither Hawkins nor Parsons asked Rothe-Kushel to leave prior to each of them grabbing and pushing him away from the microphone. PC's Ex. G, Rothe-Kushel Dep. at 115:8-116:19; 121:20-122:4. *See also* PSF ¶¶ 86-88.

31. Det. Parsons did not take any action based on Rothe-Kushel's statement and question to the speaker.

Controverted. *See* PSF at ¶¶ 103-104, 106, 110-111.

32. Either Mr. Hawkins or Det. Parsons requested assistance over the radio.

Uncontroverted.

33. Rothe-Kushel resisted attempts by Mr. Hawkins and Det. Parsons to control him and escort him from the auditorium.

Controverted. When Hawkins, who was not a law enforcement officer, unexpectedly grabbed Rothe-Kushel from behind, Rothe-Kushel instinctively and spontaneously pulled away and told Hawkins not to touch him, saying that he would leave if asked. PC's Ex. G, Rothe-Kushel Dep. at 115:18-116:25; 119:5-121:12; Pf's Ex. 1, Woolfolk Trial Transcript at 205:8-17. *See also* RPCSF ¶¶ 26, 27; PSF ¶¶ 90, 92.

34. Another individual, Steven Woolfolk, interfered with Mr. Hawkins's and Det. Parsons's attempt to remove Rothe-Kushel.

Controverted. Woolfolk intended to de-escalate the situation and facilitated the departure of Rothe-Kushel from the auditorium. Woolfolk was found not guilty of interferring and/or hindering. Pf's Ex. 1, Woolfolk Trial Transcript at 121:19-124:6; 228:12-14.

35. Mr. Woolfolk pushed Det. Parsons.

Controverted. Woolfolk did not push Parsons. Case, who was in a position to see what happened at the microphone did not see Woolfolk do anything that could be considered pushing

8

and that after Hawkins talked with her, he changed his story about where the alleged push took place. Woolfolk was found not guilty of assault on Parsons. Pf's Ex. 1, Woolfolk Trial Transcript at 124:7-23; 179:22-183:21; 228:12-14.

36. There was a physical struggle between the four individuals.

Controverted. Rothe-Kushel denies struggling with Hawkins, Parsons, or Woolfolk. When private citizen Hawkins unexpectedly grabbed Rothe-Kushel from behind, Rothe-Kushel instinctively and spontaneously reacted by attempting to pull away and by asking that hands be removed from him, saying that he would leave if asked. PC's Ex. G, Rothe-Kushel Dep. at 115:18-116:25; 119:5-121:12; Pf's Ex. 1, Woolfolk Trial Transcript at 205:8-17; PC's Ex. F, Hawkins Dep. at 178:22-179:19; 180:13-21. Once hands were removed from Plaintiff he was allowed to go get his bag and he followed Woolfolk out of the auditorium on his own accord. Pf's Ex. 1, Woolfolk Trial Transcript at 207:5-12. Rothe-Kushel never touched Hawkins. PC's Ex. G, Rothe-Kushel Dep. at 257:18-259:16. *See also* RPCSF ¶¶ 26, 27, 33; PSF ¶ 90.

37. After the physical struggle ended, Mr. Woolfolk and Rothe-Kushel exited the auditorium into the lobby.

Uncontroverted that Woolfolk and Plaintiff exited the auditorium into the lobby. But controverted that it was after a physical struggle ended. *See* RPCSF ¶ 36 with regard to the allegation of physical struggle. *See also* PSF ¶ 92.

38. Det. Curley did not enter the auditorium to respond to the request for assistance.
Uncontroverted.

39. Det. Curley stayed in the lobby.
Uncontroverted.

40. Det. Parsons instructed Det. Curley to identify Rothe-Kushel.

Uncontroverted.

41. Rothe-Kushel refused to provide Det. Curley with his identification.

Controverted in part. Rothe-Kushel did not refuse to provide Detective Curley with his identification. But before he would provide it, he wanted to know if he was being detained and why and why there was any need to provide his identification. He did get his identification out to show Curley that he had it to provide, intending to provide it, but then he was grabbed by Parsons to be arrested and put in handcuffs and his wallet and identification fell to the floor. The defendant officers then had his identification in their possession. PC's Ex. G, Rothe-Kushel Dep. at 309:23-313:3.

42. Rothe-Kushel demanded information from Det. Curley and argued with him.

Uncontroverted, *but see* RPCSF ¶ 41 regarding requests or "demands" for information and argument.

43. Det. Curley asked for identification from Rothe-Kushel numerous times.

Uncontroverted.

44. Rothe-Kushel did not provide identification or his name.

Controverted. *See* RPCSF ¶ 41 regarding providing police with access to his identification information.

45. Det. Parsons witnessed Rothe-Kushel's refusal to provide identification to Det. Curley.

Controverted. *See* RPCSF ¶ 41. When Parsons returned from dealing with Woolfolk, Plaintiff's identification was in Plaintiff's hand and was sent flying along with his wallet. PC's Ex. G, Rothe-Kushel Dep. at 309:23-313:3.

46. When Det. Parsons determined that it was appropriate to arrest, Rothe-Kushel

10

resisted the officers' attempts to place handcuffs on him by tensing up, pushing back, and refusing to give up his hands.

Plaintiff objects to the legal conclusions stated in Exhibit B, Parsons Affidavit ¶ 47 that it was appropriate to arrest him and denies the same. Controverted as to the facts stated in Parsons Affidavit ¶ 47. Because Plaintiff was surprised that he was being grabbed to be arrested, he may have flinched a little bit, but he did not resist being arrested by tensing up pushing back and refusing to give up his hands. PC's Ex. G, Rothe-Kushel Dep. at 313:4-11.

47. On-duty officers responded to the library to take Rothe-Kushel into custody.

Uncontroverted.

48. On-duty sergeants also responded to the library.

Uncontroverted.

49. Det. Parsons was familiar with the Kansas City, Missouri ordinances.

Controverted in part. Detective Parsons may have been familiar with the ordinances quoted in part in PCSF ¶¶ 50 and 51 below. But he was untrained with regard to how they have been interpreted to protect free speech in Missouri. *See* PSF ¶¶ 81-85, 103, 111, 116, 118, 120, 121.

50. "Any person who, with intent to provoke a breach of the peace or whereby a breach of the peace may be occasioned, … acts in such a manner as to annoy, disturb, interfere with, obstruct or be offensive to others or to any lawful assemblage" commits the offense of disorderly conduct. Kansas City, Mo., Code of Ords., § 50-164 (Supp. Feb. 29, 2016).

Uncontroverted that the ordinance reads as quoted.

51. "No person shall, in the city, disturb the peace of any person by … obstreperous conduct…." Kansas City, Mo., Code of Ords., § 50-167 (Supp. Feb. 29, 2016).

11

Uncontroverted that the ordinance reads as quoted.

52. "Any person who shall in any way or manner hinder, obstruct, molest, resist or otherwise interfere with … any officer of the city police department or any member of any other law enforcement agency or police force, in the discharge of his/her official duties shall be guilty of an ordinance violation." Kansas City, Mo., Code of Ords., § 50-44 (Supp. Feb. 29, 2016).

Uncontroverted that the ordinance reads as quoted, but omits the City's interpretive note: "State law reference – Similar provisions, R.S.Mo. 575.150." *See* https://library.municode.com/ mo/kansas_city/codes/code_of_ordinances?nodeId=COORKAMIVOII_CH50OFMIPR_ARTIIO FAGADJU_S50-44OBREPUSAOFEMIN.

53. A bias code on a report is used for statistical purposes.

Controverted that keeping statistics is the only purpose. As can be seen in PCSF ¶¶ 54 and 55 below, the bias code reports are sent to the state government, the federal government, including the FBI, and the Board of Police Commissioners, presumably for the use of law enforcement or the prevention of bias crimes.

54. Statistics, including bias coded crimes, are generally sent to the federal and state governments.

Uncontroverted.

55. Even though the report on Mr. Rothe-Kushel's arrest contained a bias code, it was never included on a weekly or monthly report, never reported to the Board, never reported to the FBI, never sent to the state, and never reported within the department outside of the PIC unit and Records Management.

Uncontroverted. *But see* PSF ¶¶ 105, 107, 110.

12

**PLAINTIFF'S RESPONSES TO DEFENDANTS SMITH AND COMMISSIONERS'
STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

1. Det. Parsons and Det. Curley went through the Kansas City, Missouri Police Academy.

Uncontroverted.

2. Det. Parsons received 930 hours of training at the academy, including 32 hours in Missouri Statutory Law, 30 hours in Constitutional Law, 13 hours in Traffic Law, 4 hours in Minority Relations, 14 hours in Cultural Diversity, 4 hours in Ethics & Professionalism, 10 hours in Introduction to Report Writing/Narrative Development, 16 hours in Report Writing Exercises, 26 hours in County & Municipal Offense Investigation, and 4 hours in Traffic Codes/City Ordinance Review.

Uncontroverted.

3. Additionally, Det. Parsons received 525.60 hours of training between 2003 and May 9, 2016.

Uncontroverted.

4. In 2004, Det. Parsons received Racial Profiling training.

Uncontroverted.

5. In 2005, Det. Parsons received Racial Profiling training, Community Policing Patrol Strategies training, and Tiburon/CAD Training 4-hour Course.

Uncontroverted.

6. In 2006, Det. Parsons received Racial Profiling training.

Uncontroverted.

7. In 2007, Det. Parsons received Legal Updates training and Racial Profiling training.

Uncontroverted.

13

8.  In 2008, Det. Parsons received the following trainings: Unleashing Power of Unconditional Positive Respect, Arab, Muslim, and Sikh Cultural Competency, and Legal Updates.

Uncontroverted.

9.  In 2009, Det. Parsons received the following trainings: Legal Jeopardy, NIBRS Training, and FSA, which included racial profiling training.

Uncontroverted.

10.  In 2012, Det. Parsons received Power 4 Synergy training, which included racial profiling training, and 2012 Legal Issues training.

Uncontroverted.

11.  In 2013 and 2014, Det. Parsons received 2013 and 2014 Legal Issues training, respectively.

Uncontroverted.

12.  In 2015, Det. Parsons received Fair & Impartial Policing training and Legal In-Service training.

Uncontroverted.

13.  Det. Parsons received numerous other trainings from 1997 through 2002, including legal updates.

Uncontroverted.

14.  Det. Curley received 930 hours of training at the academy, including 32 hours in Missouri Statutory Law, 30 hours in Constitutional Law, 13 hours in Traffic Law, 4 hours in Minority Relations, 14 hours in Cultural Diversity, 4 hours in Ethics & Professionalism, 10 hours in Introduction to Report Writing/Narrative Development, 16 hours in Report Writing

Exercises, 26 hours in County & Municipal Offense Investigation, and 4 hours in Traffic Codes/City Ordinance Review.

Uncontroverted.

15. Additionally, Det. Curley received 603.45 hours of training between 2003 and May 9, 2016.

Uncontroverted.

16. In 2003, 2004, and 2005, Det. Curley received Racial Profiling training each year.

Uncontroverted.

17. In 2006, Det. Curley received the following training: Racial Profiling training, Culturally Proficient Policing and Comm. Interaction, and LE, The States, Holocaust, and Racism.

Uncontroverted.

18. In 2007 and 2008, Det. Curley received Legal Updates training and Racial Profiling training each year.

Uncontroverted.

19. In 2009, Det. Curley received the following trainings: Legal Jeopardy, NIBRS Training, and FSA, which included racial profiling training.

20. In 2011, Det. Curley received Legal Issues 2011 training.

Uncontroverted.

21. In 2012, Det. Curley received Power 4 Synergy training, which included racial profiling training, and 2012 Legal Issues training.

Uncontroverted.

22. In 2013 and 2014, Det. Curley received 2013 and 2014 Legal Issues training,

15

respectively.

Uncontroverted.

23. In 2015, Det. Curley received Fair & Impartial Policing training and Legal In-Service training.

Uncontroverted.

24. Det. Curley received numerous other trainings from 1997 through 2002, including legal updates and racial profiling training.

Uncontroverted.

25. At the academy, recruit police officers receiving training on constitutional law, Missouri statutory law, and city ordinances of Kansas City, Missouri.

Uncontroverted.

26. The First Amendment is covered in the constitutional law block of training.

Uncontroverted.

27. The training consists of going over relevant case law and describing that in practical terms for police officers to be able to apply that on a daily basis during their tour of duty.

Uncontroverted that such is the stated goal of said training.

28. The constitutional law block of training is separate from Missouri statutes and city ordinances.

Uncontroverted.

29. The constitutional law block includes training on the First, Fourth, Eighth, and Fourteenth amendments.

Uncontroverted.

30. After the academy, police officers are required to engage in annual training that is

16

administered and certified by the Missouri Peace Officers Standards and Training, or POST.

Uncontroverted.

31. The department also provides yearly in-service training that includes legal updates from the Office of General Counsel.

Uncontroverted.

32. At the academy, recruits are trained that there are both state and municipal laws governing trespass and the specifics of those laws.

Uncontroverted that the cited deposition states that recruits are trained that there are both state and municipal laws governing trespass. Controverted in that "the specifics" is too broad and vague for Plaintiff to know what is intended by that phrase. The cited deposition only refers to certain specific matters that are covered, as follows: the person subject to trespass must not reside there or have permission to be there; written or verbal notice must be given prior to arrest; and, the owner, manager or somebody responsible for the property must be willing to sign a complaint *before the person is arrested*. Here, the Library managers in charge of the facilities were adamantly opposed to the arrest, and the opposition to the arrest by one of them – Steven Woolfolk – resulted in his own arrest. *See also* PSF ¶¶ 88, 89.

33. The First Amendment component of the academy course involves discussing the provisions of the First Amendment.

Uncontroverted.

34. The content of the course, and the academy curriculum, is dictated by the state or the POST Commission.

Uncontroverted.

35. The POST-dictated curriculum consists of reviewing the content of the First

17

Amendment, talking about the types of speech, and then focusing on the types of speech that are not protected by the First Amendment.

Uncontroverted.

36. One aspect of types of speech that are not protected is time, place, and manner aspects of First Amendment activities.

Uncontroverted.

37. Officers are trained that you cannot take any action based on the content of the speech.

Uncontroverted.

38. Officers with the Kansas City, Missouri Police Department receive training on unconscious bias.

Uncontroverted.

39. Part of the training is to attempt to self-identify any unconscious bias an officer may have.

Uncontroverted.

40. The unconscious bias training is called Fair and Impartial Policing.

Uncontroverted.

41. The department required all sworn officers to attend the Fair and Impartial Policing training in 2015.

Uncontroverted.

42. The training teaches the officers to recognize potential biases to speech that the officer has a deep political distaste for and to not allow that to affect their ability to be a professional police officer.

Uncontroverted that such is the stated goal of the training.

43. The department provided training in report writing that discussed bias crime coding when it switched over to the Tiburon system.

Uncontroverted.

44. The department also provided an update when Uniform Crime Reporting updated its manual in 2016.

Uncontroverted.

45. Even though the report on Mr. Rothe-Kushel's arrest contained a bias code, it was never included on a weekly or monthly report, never reported to the Board, never reported to the FBI, never sent to the state, and never reported within the department outside of the PIC unit and Records Management.

Uncontroverted, but Plaintiff was unaware that it was so limited until the deposition of Cristin Allen was taken. He learned that Detective Parsons worked for the terrorism task force and feared that he was labeled as a potential terrorist within federal databases. *See* PSF ¶ 104-107, 110.

46. Officers received a booklet from the academy in 2007 that explains the bias coding for the bias code box in the Tiburon system and then an update in 2016.

Uncontroverted.

47. After a diligent search that involved speaking with just about all of the command staff and the current tactical response commander, the department was unable to find any instances of an officer disciplined for violations or potential violations of First Amendment policies.

Uncontroverted.

19

48. The search included speaking with the watch commanders and division commanders to see if they remembered any issues with the First Amendment.

Uncontroverted.

49. If a sergeant or other supervisor received multiple similar complaints about an officer, even if the sergeant exonerated the officer, the department would expect there to be follow up because it would be a red flag.

Uncontroverted.

50. An on-duty sergeant, or other supervisor, responds to arrests by off-duty officers.

Uncontroverted.

51. Sergeants review reports written by detectives and officers.

Uncontroverted.

52. Sergeants approve reports written by detectives and officers.

Uncontroverted that this is the policy and custom, but in this case, Parsons' direct supervisor, Sergeant Wynne, did not sign off on Detective Parsons' report. Pf's Ex. 28, Wynne Dep. at 36:17-21.

## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

### The Event Is Planned

1. Circa 2015, the Jewish Community Foundation of Greater Kansas City ("JCF") working in concert with the Harry S Truman Library Institute ("TLI"), established a lecture series to be known as the Truman and Israel Lecture Series. The lecture was established to "explore President Harry Truman's courageous decision to recognize the State of Israel and the impact that decision had on world history." Pf's Ex. 3, Burden Dep. at 2:25-3:10; Pf's Ex. 4,

Brochure. JCF and TLI determined that the inaugural lecture[4] would be held at the Truman Forum Auditorium at the Plaza Branch of the Kansas City Public Library ("KCPL").

2. Rothe-Kushel learned about the Event from the KCPL website and attended it to record the Event, potentially ask questions during a Q-and-A, and to follow up during or after the book signing, for possible distribution online, as part of a documented analysis, or by other means, if matters of public interest were discussed by or with the Ambassador or others at the Event. PC's Ex. G, Rothe-Kushel Dep. at 53:19-65:23; 316:7-321:11.

***Security Planning for the Event Resulted in a Flawed Plan***

3. On May 3, 2016 a telephone conference call was held in part to plan security for the Event. On the call were the Executive Director of the Foundation, Lauren Hoopes; Alex Burden, Executive Director of the Truman Library Institute; Blair Hawkins, who headed security for the Foundation for the Event; and Joshua Stein and Brooke Hardy of the Foundation. No one from the Kansas City Library was on the call. Pf's Ex. 2, Hardy Dep. at 23:12-25:16; JCF Rule 30(b)(6) Dep. at 75:3-19.

4. The participants on the May 3 security planning conference call discussed "protestors and what to do with them". Pf's Ex. 3, Burden Dep. at 87:16; Pf's Ex. 2, Hardy Dep. at 26:10-20.

5. The participants on the May 3 security planning conference call anticipated the possibility of a protest during the question and answer period following the speech. Pf's Ex. 2, Hardy Dep. at 29:9-19; 31:12-14.

6. In the May 3 security planning conference call it was agreed that a protest at the Event would be considered a disturbance. Pf's Ex. 2, Hardy Dep. at 27:7-13

---

[4]Hereinafter referred to as "the Event".

7.  During the May 3 security planning conference call the participants discussed removing a protestor and Hawkins said that he would participate in such a removal. Pf's Ex. 2, Hardy Dep. at 26:10-20.

8.  In the May 3 security planning conference call the participants agreed that in the event of a "disturbance" – "protests" having been equated with "disturbances" and difficult questions being equated with "disruption" – Burden or Hoopes would signal Hawkins for the removal but if Burden and Hoopes were unable to signal Hawkins, Hawkins would "use his own professional judgment as to how to proceed". But Hawkins did not distinguish between removing protestors as opposed to disturbers. Pf's Ex. 3, Burden Dep. at 86:9-90:16; Pf's Ex. 2, Hardy Dep. 26:17 to 27:13; 28:8-15.

9.  Hawkins was aware that he would be given a signal to remove a protester by Hoopes looking or pointing at the protester and then looking at Hawkins or by the cutting off of the microphone. PC's Ex. F, Hawkins Dep. at 18:17-24:9.

10.  The security planning conference call participants also agreed that JCF and TLI representatives could have the microphone cut off as a signal to remove protesters. Pf's Ex. 1, Woolfolk Trial Transcript at 10:16-12:10.

11.  In the May 3 security planning conference call there was no discussion as to the right of a questioner to say or ask what the questioner wanted. Pf's Ex. 2, Hardy Dep. at 32:11-16.

12.  JCF's plan for security involved Hawkins hiring off-duty KCPD police officers. PC's Ex. F, Hawkins Dep. at 30:11-14; 80:5-13; Pf's Ex. 5, JCF Rule 30(b)(6) Dep. at 87:2-17.

**The Event Was Arranged and Advertised as a Public Event**

13.  The lecture by Ambassador Ross followed by a Question and Answer session in the Truman Forum of the Plaza Branch of the Kansas City Public Library was a public event, open

22

to the public. Pf's Ex. 6, Hoopes-Hawkins Email, Jan. 29, 2016 (event "free of charge" and "will be widely promoted throughout Kansas City"). It was marketed as a public event by the JCF and TLI. Pf's Ex. 7, Flyer, May 9, 2016 event ("7:00 p.m. Truman and Israel Lecture. The Lecture is a free public program").

14. No person with TLI, JCF, or the Library told either Hawkins or any off-duty officer that the Event was a private function and neither Hawkins nor Parsons identified anyone from the sponsoring organizations claiming to have said the Event was private. Pf's Ex. 32, Parsons Dep. Excerpts[5] at 44:23-45:2.

15. Sgt. Satter was the ranking police officer at the Event and he knew the Library was involved in the Event and remembers there was a private function downstairs and then after that the public was allowed to enter. Pf's Ex. 14, Satter Dep. at 55:8-22.

16. Satter understood the First Amendment applies on government property when the public is invited and that it doesn't have to be outside on the street. Pf's Ex. 14, Satter Dep. at 74:4-17.

17. Satter viewed an event as protected by the First Amendment if the public is allowed to attend and there is audience participation. Pf's Ex. 14, Satter Dep. 75:14-76:2.

18. The JCF admitted that the Event was public. Pf's Ex. 5, JCF Rule 30(b)(6) Dep. at 14:2-4 (The JCF's "information was consistently that the lecture portion would be free and open to the public.")

19. KCPL, JCF, and TLI advertised the lecture portion of the Event as free and open to the public. Pf's Ex. 3, Burden Dep. at 40:13-23; 42:13-24; 47:7-48:14; Pf's Ex. 8, Bayer-Hardy

---

[5]Taken in *Woolfolk v. Jewish Community Foundation of Greater Kansas City, et al.*, Circuit Court of Jackson County, Missouri Case No. 1816-CV12059.

Email with News Release, April 7, 2016; Pf's Ex. 9, Rowell Dep. at 42:12-43:23.

20. The TLI promoted the Event as "free and open to the public" and considered it to be a public event as had its other events been public when held at Library facilities. Pf's Ex. 3, Burden Dep. at 13:21-15:17; 63:24-64:6.

21. In correspondence, JCF and TLI referred to KCPL as a partner or "silent partner" for the Event. Pf's Ex. 3, Burden Dep. at 47:7-10; 50:24-51:18; 53:16-20; 54:4-8; 78:1-10.

22. KCPL's Rule 30(b)(6) designee, Executive Director Crosby Kemper, recalls conversation about the JCF wanting to have a private reception prior to the ambassador's speech and about whether that early part of the Event would be public or private. There was conversation back and forth and the idea of KCPL not being a co-sponsor was discussed but ultimately it was decided that the Library would be a co-sponsor and that there would be a private reception and the public speech. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 17:1-18:3; *id.* at 27:14-19.

23. JCF and TLI paid nothing to use the Public Library for the Event. Pf's Ex. 3, Burden Dep. at 55:12-17. The venue was free to JCF and TLI because the KCPL was a co-sponsor. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 27:11-13. Neither TLI nor JCF had a contract for private use of the space. Pf's Ex. 1, Woolfolk Trial Transcript at 138:2-15.

24. The Kansas City Public Library always considered the Event to be a public event, open to the public. Pf's Ex. 11, Coogan Dep. at 61:23-62:2. And the Library marketed the Event to the public by sending marketing information to 30,000 recipients of the Library's monthly calendar of events and to 24,000 recipients of Library emails. *Id.* at 65:21-66:18.

25. In its publicity for the Event, KCPL advertised itself as a co-sponsor or co-presenter. Pf's Ex. 3, Burden Dep. at 45:10-19; Pf's Ex. 5, JCF Rule 30(b)(6) Dep. at 33:21-34:12.

24

26. KCPL treated the Event as a public event because if a private group rents a room and invites the public the event is not handled by the Library's public affairs team but by a separate team and this event, held without payment of rent from JCF and/or TLI, was handled by the public affairs team. Pf's Ex. 12, Patterson Dep. at 31:3-7; Pf's Ex. 1, Woolfolk Trial Transcript at 102:5-14. *See also*, *infra* at PSF ¶ 36.

27. Members of the public attending the Ross lecture and Q-and-A session were not required to have RSVP'd, to have tickets, or to show tickets to gain admission to the Truman Forum. Pf's Ex 5, JCF Rule 30(b)(6) Dep. at 18:9-19; Pf's Ex. 2, Hardy Dep. at 33:24-34:3.

**The Library's Policies and Practices for Public Events**

28. Public events staff at KCPL, Woolfolk and Coogan, learned about the plan for significant police presence at the public forum part of the Event only days before May 9 via telephone conference with TLI's Alex Burden. Pf's Ex. 1, Woolfolk Trial Transcript at 112:2-19.

29. Woolfolk had been involved in public events programming for the Library for eleven years and had never seen a police presence like this at a public forum at the Library. Typically, on rare occasions, they have had an off-duty police officer if it was specifically requested by the speaker. Pf's Ex. 1, Woolfolk Trial Transcript at 100:13-101:23; 110:4-17; 110:1-10.

30. Free speech is an important tenet for public events forums at the Library. The Library staff are very lenient with the Q-and-A sessions. They are not concerned if somebody asks a question that others don't agree with or whether the audience responds in a negative manner or are offended. The value of free speech is in the value of other people being exposed to those ideas. Pf's Ex. 1, Woolfolk Trial Transcript at 105:8-106:7.

31. In his eleven years, Woolfolk had never seen an audience member physically

restrained and removed. As far as he knew this was the first time something like that had happened here at the Public Library. Pf's Ex. 1, Woolfolk Trial Transcript at 106:24-107:6.

32. When security officers are engaged by partner entities or others for events at the library, it is the Library's expectation that security would comply with the security rules of the Library. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 40:1-5.

33. When Alex Burden notified public events staff at KCPL, Woolfolk and Coogan, about the plan to have off-duty police officers at the Event, they were reluctant to allow it because the presence of armed police officers can chill what people are willing to say. Pf's Ex. 1, Woolfolk Trial Transcript at 112:2-19.

34. But, because of what had happened on the Jewish Community Campus, Woolfolk and Coogan understood that there was an elevated level of concern and they agreed to allow the off-duty police officers to be there that night but only upon two conditions:

1. No one was to be removed from the Library for asking an unpopular question; and,

2. Unless the person was an imminent threat the Library had to be consulted before somebody was removed.

Pf's Ex. 1, Woolfolk Trial Transcript at 112:20-113:15.

35. Alex Burden agreed to those two conditions. Pf's Ex. 1, Woolfolk Trial Transcript at 112:20-113:15.

36. If a private group rents a room and invites the public to it, it does not get handled by the Library's public affairs staff. Pf's Ex. 12, Patterson Dep. at 31:3-7. Private events are handled by a separate team. Pf's Ex. 1, Woolfolk Trial Transcript at 102:5-14.

37. The public affairs team determines how they will do the Q-and-A for public events. Pf's Ex. 1, Woolfolk Trial Transcript at 101:15-16.

38. As stated, *supra* at ¶ 30, the KCPL staff are very lenient during Q-and-A because free speech is a key tenet of the Library. Pf's Ex. 1, Woolfolk Trial Transcript at 105:12-106:7. The Library guards the First Amendment religiously. *Id*. at 211:14-212:3.

39. The Library almost always opens up the floor for questions after all public events and microphones are set up at the front of the room. Pf's Ex 1, Woolfolk Trial Transcript at 174:8-14; 210:15-25.

40. KCPL usually only mutes microphones if they are wanting the Q-and-A to end, rather than during the Q-and-A session. Pf's Ex. 13, Case Dep. 45:6-15.

41. The KCPL has had situations where the questioner was talking over the speaker and normally if it becomes monopolizing, the person is asked to let someone else have a turn. Pf's Ex. 13, Case Dep. at 45:23-46:15; *see also*, Pf's Ex. 1, Woolfolk Trial Transcript at 174:8-175:1 (participants in the Q-and-A are allowed to ask questions or voice their opinion and unless they are "getting very argumentative" or the exchange has continued "for a very, very long time," the Library allows that to happen).

42. A lot of people get up and state opinions during the Q-and-A, *i.e.*, they do not always actually ask a question. Pf's Ex. 13, Case Dep. at 54:22-55:5.

43. The normal practice at the Library is to ask someone to relinquish the microphone to another participant. Pf's Ex. 13, Case Dep. at 90:1-6; Pf's Ex. 1, Woolfolk Trial Transcript at 106:8-25.

44. It was not proper Library protocol to cut off someone's question in the middle. Pf's Ex. 1, Woolfolk Trial Transcript at 187:20-188:7.

45. Even if the questioner has engaged in a passionate argument with the presenter, no one had ever been removed from an event at the Library. Pf's Ex. 1, Woolfolk Trial Transcript

27

at 179:5-179:10.

46. The security personnel acted contrary to the policy and procedure of the Library in that they placed hands on Rothe-Kushel. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 42:18-43:3.

***How the Event Was Staffed by the Participating Organizations***

47. Steve Woolfolk is and was at the time of the Event the director of programming and marketing at the KCPL. In his eleven years with the Library (as of September, 2017) he had previously served as assistant director of public affairs as well as on the public programming team. Pf's Ex. 1, Woolfolk Trial Transcript at 100:18; 100:21-101:2.

48. Blair Hawkins was the Director of Community Security for the "Jewish Community" on assignment to the Jewish Community Foundation to provide security for the Event. PC's Ex. F, Hawkins Dep. 9:1-6; 13:10-16.

49. Hawkins engaged three off-duty Kansas City, Missouri police officers to provide security at the Event: Sergeant Satter and Detectives Curley and Parsons. A security officer provided by the Kansas City Public Library was also present in the building. PC's Ex. F, Hawkins Dep. at 80:5-13.

50. For the Event in the Truman Forum in the Plaza Branch of the Kansas City Public Library, the professional security personnel were positioned as follows when the speech ended and the Q-and-A began:

a. Hawkins was in the rear of the auditorium, audience left, near the main entrance to the auditorium. PC's Ex. F, Hawkins Dep. at 140:23 to 142:11.

b. Parsons was audience right, in a slightly elevated overflow seating area. PC's Ex. A, Parsons Dep. at 143:13 to 144:2.

c. Curley and Satter were outside the auditorium. PC's Ex. C, Curley Dep. at 44:1-3;

28

Pf's Ex. 14,  Satter Dep. 82:14-18.

51.  For the Event in the Truman Forum in the Plaza Branch of the Kansas City Public Library, representatives of the presenting organizations with assigned duties were positioned as follows when the speech ended and the Q-and-A began:

a.  Alex Burden of the Truman Library Institute was seated near the middle of the front row.  Pf's Ex. 3, Burden Dep. at 114:24 to 115:3.

b.  Lauren Hoopes, Executive Director of the Jewish Community Foundation, was seated in the front row two seats to the right of Burden.  Pf's Ex. 15, Hoopes Dep. at 5:4-7; 82:12-18.

c.  Kim Rausch, Director of Development for the Truman Library Institute, stood by a microphone audience left as the Q-and-A  began.  Pf's Ex. 16, Rausch Dep. at 4:22 to 5:20; 33:1-23.

d.  Joshua Stein, Director of Fund Development for the Jewish Community Foundation was at the audience right microphone.  Pf's Ex. 17, Stein Dep. at 5:12-21; 100:6-14.

e.  Leslie Case, the events audio and visual technician for the Kansas City Public Library was at the sound table or booth about half way back and audience right in the Truman Forum auditorium.  Pf's Ex. 13, Case Dep. at 9:12-20; 42:12-19.

f.  Steve Woolfolk, KCPL's Director of Programming and Marketing, was audience right to monitor the Q-and-A and stationed near Parsons.  Pf's Ex. 1, Woolfolk Trial Transcript at 120:8-121:21; 222:7-224:16.

g.  Carrie Coogan, then an administrative assistant, now Deputy Director of Public Affairs and Community Engagement for KCPL, was seated in the lobby area.  Pf's Ex. 1, Woolfolk Trial Transcript at 120:8-121:21; 222:7-224:16.

29

***This Event Deviated from Usual Public Events at the KCPL***

52. The Library had held what were much, much rowdier events and nothing like this had ever happened. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 30:20-32:14.

53. An event partner had never requested audio-visual personnel to cut microphones at an event prior to this event. Pf's Ex. 1, Woolfolk Trial Transcript at 175:2-12. *See also*, *infra*, at PSF ¶ 72.

54. The Library has never had anyone physically assaulted like Rothe-Kushel was. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 29:25-30:2.

55. KCPL had never had a situation like this where someone who was not hired by the Library would put their hands on a questioner. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 30:20-25.

56. There had never been a situation at Library public events where someone had to be removed. Pf's Ex. 1, Woolfolk Trial Transcript at 107:1-3.

***The Question-and-Answer Session after the Public Speech Established a Public Forum***

57. Kansas City Public Library employees Leslie Case and Willie Dilworth placed the microphones out for the Q-and-A. Pf's Ex. 13, Case Dep. at 84:21-23.

58. Sgt. Satter was the ranking police officer at the Event and he knew the Library was involved in the Event and remembers there was a private event downstairs and then after that the public was allowed to enter. Pf's Ex. 14, Satter Dep. at 55:8-22.

59. Satter understood that he was there only to enforce the law and not instructions of the private employer. Pf's Ex. 14, Satter Dep. at 101:10-21.

***Rothe-Kushel Was Removed for the Content of His Speech***

60. Rothe-Kushel did not raise his voice until he was aggressively grabbed and pushed. Pf's Ex. 1, Woolfolk Trial Transcript at 122:3-23.

61. Rothe-Kushel's actions and behavior were consistent with normal Q-and-A at KCPL's public events. His tone and volume were consistent with normal behavior at the library during Q-and-A. He spoke for 90 seconds in a civil tone of voice, so objections had to be about the content. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 28:22-29:8.

62. Woolfolk knew that someone was being removed from the building for asking an unpopular question. Pf's Ex. 1, Woolfolk Trial Transcript at 122:24-25.

63. The audience's audible response to the interchange between the speaker and Rothe-Kushel was not threatening. Rather, it was a sign of an engaged and interested audience. Pf's Ex. 13, Case Dep. at 105:4 – 11.

64. Bethany Rowell was then a KCPL administrative assistant and she is now Public Affairs Signature Events Coordinator for KCPL. Pf's Ex. 9, Rowell Dep. at 7:17-8:5.

65. Based on Rowell's experience with Q-and-A's at Library events, nothing occurred during the interchange between the ambassador and Rothe-Kushel that could have resulted in his being evicted from the auditorium. Pf's Ex. 9, Rowell Dep. at 50:2-12.

66. Satter, who had earlier found First Amendment-related items when he searched Rothe-Kushel and McCarron, acknowledged that Rothe-Kushel was within his rights to ask difficult questions and record responses. PC's Ex. G, Rothe-Kushel Dep. at 85:20-86:2; 93:17-22.

67. Satter was told that Rothe-Kushel asked a weird question about 9/11. Pf's Ex. 14, Satter Dep. at 111:5-25.

31

68. Satter did not hear the question Rothe-Kushel asked during the Q-and-A but was repeating what he had been told by either Parsons or Hawkins about what had taken place in the Q-and-A. Pf's Ex. 14, Satter Dep. at 114:22-115:15.

69. Satter understood that this weird question was related to why Rothe-Kushel was approached in the auditorium. Pf's Ex. 14, Satter Dep. at 115:16-22.

***The Microphone Was Muted – When and Why***

70. Near the end of the ambassador's speech, the microphones were set up in the aisles to facilitate the Q-and-A. Pf's Ex. 13, Case Dep. at 84:7-20.

71. Leslie Case, KCPL's audiovisual technician for the Event, was operating the audio system from a table toward the back-right of the auditorium where, before the Q-and-A began, but after the mics were in position, she was separately approached by Joshua Stein of the Jewish Community Foundation and Kim Rausch of the Truman Library Institute who told Case that if either of them gave Case a "signal" she would "need to mute the microphone". Case did not agree to mute the microphone at their signal. Pf's Ex. 19, Case Statement; Pf's Ex. 13, Case Dep. at 43:18 to 44-4; 85:9-12; 98:4-9; Pf's Ex. 17, J. Stein Dep. at 98:13-99:21.

72. For public events that have a cosponsor, Case had never been asked to cut off a microphone by a cosponsor. Pf's Ex. 1, Woolfolk Trial Transcript at 175:2-12.

73. The separate statements Rausch and Stein made to Case were so similar that Case thought "they had communicated to each other about this." Pf's Ex. 13, Case Dep. at 89:1-11.

74. Case was concerned and unsure what to do, so she decided to use her own best judgment. Pf's Ex. 1, Woolfolk Trial Transcript at 176:10-16.

75. As the Q-and-A was about to begin, Rausch stood by the microphone at audience left and Stein at the microphone at audience right. Pf's Ex. 17, J. Stein Dep. at 98:13-99:21.

76. Case considered Rothe-Kushel's remarks at the microphone to be "long winded but civil" and near the end of those remarks Rausch "raised her hand in a slicing motion while looking at" Case. Case took Rausch's action to be a "signal to cut" the microphone but Case did not cut the microphone because she considered Rothe-Kushel's "tone of voice" to be "courteous and well-mannered". Pf's Ex. 19, Case Statement.

77. As Rothe-Kushel engaged in follow-up exchanges with Ambassador Ross, Case saw JCF's Joshua Stein approaching Rothe-Kushel for what Case thought was Stein's request to Rothe-Kushel to "relinquish the microphone to the next person" so Case muted the microphone "because we didn't need to hear that interaction". Pf's Ex. 13, Case Dep. at 55:20-56:10; 92:3-23.

78. In addition, the fact that Stein and Rausch had asked Case to cut the microphone played into her decision to cut it once she believed moderation was going to occur. Pf's Ex. 13, Case Dep. at 98:10-16.

79. Muting the microphone when a questioner is about to be asked to relinquish the microphone to the next speaker was Library practice so the request by the Library staff to the speaker would not be broadcast to the audience. Pf's Ex. 13, Case Dep. at 95:25-96:8.

80. Virtually simultaneously with Case muting the microphone, Hawkins approached Rothe-Kushel in what Case considered to be an "aggressive fashion" and Hawkins physically removed Rothe-Kushel from the microphone. Pf's Ex 19, Case Statement; Pf's Ex. 13, Case Dep. at 60:7-61:2; 92:24-95:13.

***The Nature and Content of Plaintiff's Remarks***

81. In the view of Library Director Kemper, Rothe-Kushel did not interrupt the speaker and was within the bounds of any sort of normal civil speech. Pf's Ex. 10, KCPL Rule 30(b)(6)

33

Dep. at 37:23-28:13.

82. It was Kemper's view that the content of Rothe-Kushel's question could have been the only reason for the incident because there was nothing in his actions that should have provoked the incident. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 28:22-29:12.

83. Rothe-Kushel only raised his voice to Hawkins and not to Ambassador Ross. Pf's Ex. 10, KCPL Rule 30(b)(6) Dep. at 29:9-25.

84. The best evidence of the nature and content of Plaintiff's remarks and exchange with Ambassador Ross are JCF's Exhibit 2, an excerpt from KCPL's Video/Audio and Pf's Ex. 20, the Dual Video.

85. The following is a transcription based on JCF's Ex. 2, KCPL Video/Audio and on Pf's Ex. 20, Dual Video of Plaintiff's question, Ambassador Ross' response, and the exchange that followed:

Dennis Ross: So, I'm gon--, I'm gonna take some questions. I think there are mics. You can come up to the mics.

Jeremy Rothe-Kushel: Hi. Ok, thank you. Uh, I'm very interested in the issue of tribalism and terror. Just today, I ran into an article referencing, uh, Truman's daughter Margaret's book, uh, disclosing that the, um, that, um, the, uh, Stern Gang, uh, sent mail bombs to Truman, uh, in '47. And we know that when, when I think – I can't remember which group blew up the King David Hotel – but Jews were amongst the dead, uh, involved in that "necessary statecraft", what ultimately became that. So, you see this long history of, of not only the United States, but Israel utilizing, uh, terrorism that includes potentially the death of its own tribe to advance its own, uh, geopolitical cause, all the way up into the 21st century, including September 11th and that whole mess – that I would tell people to look at, uh, Alan Sabrosky, the Jewish, uh, courageous Marine who's exposed the Zionist role in that. So, I would ask you, at what point does the Jewish diaspora, do we have to have the ethical courage – I'm a Jewish American – to point out that especially in America, both the countries that operate in our name have used terrorism way too long, including against its own citizens, to, uh, project power at home and abroad. When are we going to stand up and be ethical Jews and Americans?

Ross: Well, look, I don't think that as a matter of policy, that the United States or Israel engage in acts of terror. You know, terror is you target deliberately civilians for an expressed political purpose. You know, the idea that Israel had something to do with

34

9/11 is, is just outrageous – they had nothing to do with it.

Rothe-Kushel:  Tell that to the Marine.

Ross:  Ah.

Rothe-Kushel (continuing):  Tell that to the Marine, Alan Sabrosky.  Look him up, Jewish, American, Marine.

Ross:  You know what?  You can make up whatever you want to.

Rothe-Kushel:  I didn't make that up.

Ross:  I'm a big believer –  Well, I'm a big believer – as Patrick – Daniel Patrick Moynihan used to say – everybody's entitled to their own opinions; they're just not entitled to their own facts.

Rothe-Kushel:  True.  Go look at Septemb----

[*Case cut the microphone.*]

Rothe-Kushel (continuing):  ---ber

[*Hawkins grabs Rothe-Kushel's arm and starts pushing Rothe-Kushel away from the microphone.*]

Rothe-Kushel:  Eleventh.  Building 7 came down at free fall speed.

[*Rothe-Kushel finished his sentence.  Meanwhile Parsons began moving toward Rothe-Kushel to assist Hawkins in ejecting Rothe-Kushel.*]

Rothe-Kushel:  Do not touch me.  Get your – get your hands off of me right now.

[*By this point both Hawkins and Parsons were holding and/or grabbing Rothe-Kushel.*]

Rothe-Kushel:  You can ask – You can ask me to leave.  I will leave if asked.  I will leave if asked.  I will leave if asked.  Get your hands off me!  Get your hands off me.  I will leave if asked.

JCF's Ex. 2, KCPL Video/Audio; Pf's Ex. 20, Dual Video.

***There Was No Trespass***

86.  Virtually simultaneously with the microphone being cut, Hawkins grabbed Plaintiff

and said "You're done."  PC's Ex. G, Rothe-Kushel Dep. at 120:10-27; Pf's Ex. 20, Dual Video

35

from 2:25 to 2:28 (microphone cut at 2:26; Hawkins makes contact at 2:27); Pf's Ex. 33, Photographs of Rothe-Kushel's arm.

87. Parsons immediately grabbed Rothe-Kushel's left arm. PC's Ex. A, Parsons Dep. at 165:4-6; 168:13-21; 172:11-175:2.

88. No one told or asked Plaintiff to leave the premises before he was grabbed, pushed away from the microphone, taken to another room and arrested. Pf's Ex. 1, Woolfolk Trial Transcript at 178:14-179:4; PC's Ex. A, Parsons Dep. at 127

89. Plaintiff was charged with trespassing on "city" property although no "city" representative was at the Event, no one from the Library spoke to the arresting officers before Plaintiff was arrested, and Library officials present attempted to prevent the removal and detention and to allow Plaintiff to remain on the premises. Pf's Ex. 21, Trespass Ticket; Pf's Ex. 22, Woolfolk Dep.[6] at 210:22-211:17; Pf's Ex. 1, Woolfolk Trial Transcript at 127:5-128:6; PC's Ex. A, Parsons Dep. at 124:12-19 (claims he would have asked Hawkins if the JCF wanted to press trespass charges); 127:3-5 (claims whomever he asked – never identified – gave him permission to charge Rothe-Kushel with trespass); PC's Ex. C, Curley Dep. at 68:20-69:9 (did not participate in decision to charge Rothe-Kushel with trespass; had no contact with anyone regarding who would sign a complaint for trespass).

***There Was No Probable Cause to Arrest Rothe-Kushel for Resisting, Obstructing, or Interfering with a Public Official***

### A. In the Auditorium

90. When Hawkins unexpectedly grabbed Rothe-Kushel from behind, Rothe-Kushel initially spontaneously reacted by attempting to pull away and by asking that hands be removed

---

[6]Taken in *Woolfolk v. Jewish Community Foundation of Greater Kansas City, et al.*, Circuit Court of Jackson County, Missouri Case No. 1816-CV12059.

from him, saying that he would leave if asked. PC's Ex. G, Rothe-Kushel Dep. at 115:18-116:25, 119:5-121:12; Pf's Ex. 1, Woolfolk Trial Transcript at 205:8-17.

91. And, Hawkins was not a public official. On May 9, 2016, he was working as the Jewish Community Director of Security. Pf's Ex. 1, Woolfolk Trial Transcript at 7:19-25.

92. The charge brought by Parsons for obstruction or resisting did not refer to what happened in the auditorium with Hawkins and Parsons. Instead, that charge was about Parsons' claim that Rothe-Kushel obstructed or interfered when two police officers (Parsons and Curley), were arresting him. That event occurred in the lobby, called "foyer'"by Hawkins. PC's Ex. A, Parsons Dep. at 119:9-24; Pf's Ex. 1, Woolfolk Trial Transcript at 25:13-27:12.

93. Rothe-Kushel did not know that Parsons was a police officer because he was in plain clothes. PC's Ex. G, Rothe-Kushel Dep. at 94:20-95:4. He did not notice that Parsons was wearing a lanyard with his badge on it until they were in the lobby. *Id*. at 140:2-9. In addition, the light in the auditorium was dim. JCF's Exhibit 1, JRK and McCarron Video.

### B. In the Lobby or Foyer

94. With regard to the arrest in the lobby, because Rothe-Kushel was surprised that he was being grabbed he may have flinched a little bit, but once he knew they were putting his hands behind his back to arrest him, he did not resist at all. PC's Ex. G, Rothe-Kushel Dep. at 313:4-11.

95. Parsons did not describe resistance in the first draft of his police report, nor did he report that he had advised Rothe-Kushel that he was under arrest. Parsons added those descriptions in a subsequent draft after requesting feedback from Satter. Pf's Ex. 30, Parsons-Satter email regarding narrative. Parsons was unsure if he handcuffed Rothe-Kushel or if Curley did. Pf's Ex. 1, Woolfolk Trial Transcript at 67:22-68:1.

96. Curley did not directly observe Rothe-Kushel do anything that he believed would be cause or that ended up being cause for arrest. PC's Ex. 3, Curley Dep. at 58:22-60:20. Curley declined a request from Parsons to produce a citation for resisting and/or trespassing because Curley did not believe that he had effected the arrest. Curley also declined a request from Parsons to produce a report of the same. Pf's Ex. 31, Curley Dep. Excerpts[7] at 42:2-18. Curley understood that an arrest is effected when someone is told they are under arrest and then are physically taken into custody. *Id*. at 49:10-16.

***Defendant Parsons' Bias Aggravated the Interference with Plaintiff's Rights***

97. Satter understood that Rothe-Kushel had been pre-targeted for search after being labeled a potential protester. Pf's Ex. 14, Satter Dep. at 85:22-87:10.

98. Hawkins had pointed out Rothe-Kushel and McCarron to Satter as potential protesters. Pf's Ex. 14, Satter Dep. 85:13-25.

99. Satter assumed and believed that Hawkins had intelligence or information about Rothe-Kushel and McCarron because he knew who they were and thought they were potential protesters of the Event. Pf's Ex. 14, Satter Dep. at 86:6-87:10.

100. Hawkins provided Satter with situational awareness vis à vis Rothe-Kushel and McCarron. Pf's Ex. 14, Satter Dep. at 89:13-15.

101. Satter would not have known if Rothe-Kushel and McCarron were there for the Event or just coming to the Library had Hawkins not pointed them out as possible protesters of the Event. Pf's Ex. 14, Satter Dep. at 89:21-90:8.

102. Before the Event, Parsons was given an expenses-paid trip to Israel for the purpose

---

[7]Taken in *Woolfolk v. Jewish Community Foundation of Greater Kansas City, et al.*, Circuit Court of Jackson County, Missouri Case No. 1816-CV12059.

38

of engaging with and learning from Israeli security professionals. PC's Ex. A, Parsons Dep. at 21:10-18; 22:20-23:2; 53:25-54:3. The trip was paid for by the Jewish Federation of Greater Kansas City, co-sponsored by Secure Community Network (SCN) and authorized by Parsons' supervisor in the Fusion Center, Sergeant Robert Wynne and the major in charge of the Unit. Pf's Ex. 28, Wynne Dep. at 25:18-31:1; PC's Ex. F, Hawkins Dep. at 62:17-68:13.

103.  When Rothe-Kushel was at the microphone speaking with Ambassador Ross, Parsons was personally offended by what Rothe-Kushel was saying. PC's Ex. A, Parsons Dep. at 83:11-85:8.

104.  In his Incident Report concerning the arrest of Rothe-Kushel, Parsons coded the arrest as a Bias Crime using the Code 21 for Anti-Jewish that is designated for religious bias against those of the Jewish religion. Parsons did not believe that Rothe-Kushel was anti-Semitic. Parsons held that Rothe-Kushel was anti-Jewish state or anti-Israel. Pf's Ex. 23, Parsons Incident Report May 9, 2016; PC's Ex. A, Parsons Dep. at 131:2-9; 136:20-138:1.

105.  Arrest and incident reports, such as the one that Parsons created with an "anti-Jewish" Bias Code attached to Rothe-Kushel that are not expunged from the systems are known by KCPD to be available in and to those working in the Fusion Center. Pf's Ex. 14, Satter Dep. at 130:13-22.

106.  After the Event, Parsons refused to remove the Bias Code from the Incident Report even though the Department had determined that the acts described in the Incident Report did not constitute a bias crime, and refused to remove the code even when told to do so by the head of the division responsible for the Department's bias code data for the alleged reason that Rothe-Kushel "is an activist and very anti-Jewish". Pf's Ex. 25, Parsons' Bias Code Emails; Pf's Ex. 26, Asper Dep. at 4:6-7:23; 10:1-13:6; 15:1-16:22; 17:19-19:12. Parsons' supervisor, Sergeant

Wynne did not sign off on Parsons' report as is required for all incident reports. Pf's Ex. 28, Wynne Dep. at 36:17-21.

107. PIC and Records supervisors *claim* to have removed the Bias Code from the reports they maintain and send to the Board, the FBI, and to the state. Asper was unsure whether Regina Wagner, Supervisor of Data Entry, sent the report to the state. Pf's Ex. 26, Asper Dep. at 27:25-28:13.

108. A detective would not have the power to reject the PIC review, yet Wynne was Parsons' direct supervisor when Parsons rejected the PIC review via email due to his claimed "intelligence research." Wynne was unaware of any review process or conversations about reviewing this decision. Wynne did not approve Parsons' report with the Bias Code but was notified as his supervisor at the time. The Bias Code on Parsons' report remains unchanged. Pf's Ex. 28, Wynne Dep. at 35:9-36:21; SB's Ex. F, Allen Dep. 27:4-6; 30:2-31:13..

109. Due Process considerations for the wrongfully accused are not the operant reason for Bias Code review. There is no document or guideline to assist officers in avoiding assigning a Bias Code based upon First Amendment protected activity. There were no consequences to Parsons for his failure to comply with removing the Bias Code. SB's Ex. F, Allen Dep. at 36:9-37:9; 43:21-44:21.

110. On May 11, 2016, Parsons sent the incident report regarding the trespassing charge and assigning Rothe-Kushel with the anti-Jewish Bias Code to an unidentified party with a name and email address redacted by KCPD, in an email with the subject line "Activist to know" with photos of Rothe-Kushel, McCarron, and Woolfolk with social media account links. Pf's Ex. 27, Parsons' "Activist to Know" Email.

111. On October 6, 2016, in response to KCPD Media Captain Stacey Graves who was

40

seeking input about a story in the press about the case, Parsons wrote disparagingly of Rothe-Kushel's character, of him being described as a documentarian, his professed political ideas, questioning his honesty including asking whether Rothe-Kushel was really Jewish as stated and claiming that Rothe-Kushel used his "activism" and "viewpoint" at the Event to prevent others from speaking.  Pf's Ex. 24, Parsons' Emails Regarding Rothe-Kushel; PC's Ex. A, Parsons Dep. at 58:6-15; 62:18-67:12; 72:23-73:20; 92:23-93:9; 111:7-112:16; Pf's Ex. 29, Parsons' email attaching comments on article.

***The Dismissal of the Charges and the Nature of the Dismissals***

112.  As a result of the events on May 9, 2016 at the Public Library, Rothe-Kushel was charged with two offenses in the Circuit Court of Jackson County, Missouri, Kansas City Municipal Division.  He was charged with trespass and with obstruct or resist.  JCF's Ex. 12, Bell Affidavit at 4-5.

113.  The trespassing charge was dismissed on June 15, 2017 and the obstruct or resist charge was dismissed on July 31, 2017.  JCF's Ex. 12, Bell Affidavit at 12-16.

114.  The charges were not dismissed pursuant to a diversion agreement with the City Prosecutor.  JCF's Ex. 12, Bell Affidavit at 1-16.

***Police Department Policies Concerning Protests and Free Speech***

115.  Police Department Police Annex D: "Protest Demonstrations/Strikes", provides that officers are mandated to protect citizens in the exercise of their right to protest.  KCPD Rule 30(b)(6) (Jantzen) Dep. at 10:8-11:16.

116.  Annex D recognizes that protests "*will* result in some disruption in varying degrees of normal activities."  KCPD Rule 30(b)(6) (Jantzen) Dep. at 10:23-11:5 (emphasis added).

117.  Annex D further provides that when protestors "become disruptive . . . the primary

41

police objective is to restore order." KCPD Rule 30(b)(6) (Jantzen) Dep. at 11:6-12.

118. Police officers are trained and expected to balance "minor inconveniences", including First Amendment protected activities, versus "when they should make an arrest". KCPD Rule 30(b)(6) (Jantzen) Dep. at 12:12-13:1.

***The Off-Duty or Secondary Employment Policies and Practices of the Police Department***

119. While working off-duty, formally "secondary employment", police officers must adhere to department policies and its code of ethics. KCPD Rule 30(b)(6) (Jantzen) Dep. at 12:21-13:10.

120. Off-duty officers may only make arrests when the arrests are justified by statutes or ordinances, not just to satisfy the requests or desires of their private employers. KCPD Rule 30(b)(6) (Masters) Dep. at 9:25-11:1; 16:9-17:3.

121. Officers working off-duty must determine independently of the views of their private employers whether or not an event is public or private, irrespective of the views of such employers. KCPD Rule 30(b)(6) (Jantzen) Dep. at 38:12-39:9; 42:10-22. That is the case also even if a First Amendment activity causes a minor inconvenience to the private employer. *Id.* at 44:7-20.

ARGUMENT

## Introduction

Jeremy Rothe-Kushel was standing at a microphone exchanging important and politically-charged ideas with the former United States Ambassador to Israel. PSF ¶¶ 84, 85. This exchange was at a public speaking event in the Truman Forum Auditorium of the Plaza Branch of the Kansas City Public Library (the Event) to which tens of thousands members of the public had been invited and several hundred were in attendance. The Event was planned and advertised as a public event. No tickets, reservations, or other limiting requirements restricted attendance at the Event. PSF ¶¶ 13-27. No person associated with organizations sponsoring the Event told anyone with law enforcement or security that the Ambassador's speech was a private event. PSF ¶ 14.

Rothe-Kushel was at the Event possibly to speak if there was a Question and Answer session and possibly to record, publish, and comment on remarks by the Ambassador. There was a Q-and-A session. Rothe-Kushel did exchange comments with the Ambassador at the microphone provided by the Library for members of the public who wished to speak. Those exchanges concerned historical events with current relevance. By implication the expressed viewpoints were critical of American and Israeli statecraft and the topic was political and controversial. The Ambassador and some members of the audience disagreed with the viewpoints or implications of the remarks of Rothe-Kushel. PSF ¶ 63.

Unknown to Rothe-Kushel, Blair Hawkins, a private citizen, had arranged security for the Event, engaging three off-duty Kansas City police officers to be present at the event. PSF ¶¶ 12, 49. During Rothe-Kushel's verbal exchanges with the Ambassador, Hawkins approached Rothe-Kushel who was in mid-sentence and grabbed him as one of the off-duty officers,

43

Detective Brent Parsons, in plainclothes, also grabbed Rothe-Kushel and pushed him away from the microphone, ending Rothe-Kushel's verbal exchange of viewpoints with the Ambassador. PSF ¶¶ 86, 87. In grabbing Rothe-Kushel and pushing him away from the microphone, Parsons was executing the flawed "security plan" that Hawkins had hired him for and briefed him about, a plan that called for the removal of "protestors" irrespective of whether or not they had caused a disturbance. PSF ¶¶ 3-12, 49.

Rothe-Kushel was seized, arrested, and charged by Det. Parsons with trespassing on "City" property although the "City" did not own the property. Nor had anyone asked or told Rothe-Kushel to leave the premises, and so he had not refused to leave. PSF ¶ 89. And similarly, none of the sponsors of the Event had asked that he be charged with trespass. Parsons also charged Rothe-Kushel with resisting arrest even though the actions of Rothe-Kushel did not meet the elements required for a violation of the applicable ordinance. PSF ¶ 92. Both charges were eventually dismissed by the City Prosecutor. And this litigation followed asserting, *inter alia*, claims of constitutional violations by Parsons. PSF ¶¶ 112-114.

## I. THE COURT MUST CONSIDER THE FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF AND GIVE HIM THE BENEFIT OF REASONABLE INFERENCES.

Summary judgment is appropriate when the movant establishes that there is "no genuine issue as to any material fact" and that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In determining whether the moving party is entitled to summary judgment, if there is a genuine issue as to the facts, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. FED. R. CIV. P. 56 (c); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

Parsons' argument that he is entitled to summary judgment on the basis of qualified

immunity requires that the Court undertake the summary judgment analysis established by Fed. R. Civ. P. 56 (c) in the context of qualified immunity jurisprudence. Parsons bears the burden of establishing the relevant predicate facts for application of the qualified immunity defense. *White*, 519 F.3d at 814. Resolution of questions of qualified immunity at summary judgment entails a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (*per curiam*). The first query is whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Id*. at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong requires a determination of whether the right in question was clearly established at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Government actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. The "salient question . . . is whether the state of the law" at the time of the incident provided the actors with "fair warning" that their alleged conduct was unconstitutional. *Id.* at 741.

Although courts have discretion to decide the order in which to undertake the analysis, under neither prong may a court resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan*, 572 U.S. at 656 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2 (2004) (*per curiam*); *Saucier*, 533 U.S. at 201; *Hope*, 536 U.S. at 733, n. 1). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

In *Tolan*, the Supreme Court reemphasized its earlier qualified-immunity jurisprudence:

> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier*, *supra*, at 201, 121 S.Ct. 2151; *see also*, *Anderson v. Creighton*, 483 U.S. 635, 640-641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. *See Brosseau*, *supra*, at 195, 198, 125 S.Ct. 596 (inquiring as to whether conduct violated clearly established law "'in light of the specific context of the case'" and construing "facts . . . in a light most favorable to" the nonmovant).

*Tolan*, 572 U.S. at 657 (emphasis added). The Supreme Court concluded that by failing to credit evidence that contradicted some of its key factual conclusions, the district court had improperly weighed the evidence and resolved disputed issues in favor of the moving party and remanded for a determination of whether, when Tolan's evidence was credited and inferences reasonably drawn in his favor, the defendant's actions violated clearly established law. *Id.* at 657, 660.

## II. DEFENDANT PARSONS IS NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE HE VIOLATED ROTHE-KUSHEL'S CLEARLY ESTABLISHED RIGHTS.

Plaintiff undertakes the qualified immunity analysis by first examining whether Rothe-Kushel's rights were violated before addressing the question of whether those rights were clearly established.

### A. Rothe-Kushel's First Amendment rights were violated.

#### 1. Interrupting Rothe-Kushel's speech violated his First Amendment rights.

Three considerations underlie any First Amendment analysis of a challenge that a plaintiff was excluded from an event: (1) whether the speech is "protected by the First Amendment"; (2) "the nature of the forum"; and, (3) whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 192 (3d Cir. 2008) (citing and quoting *Cornelius v.*

46

*NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  Parsons does not contend that Rothe-Kushel's speech was not protected, nor does he seriously contend that the lecture and the Q-and-A in the Truman Forum Auditorium was not a public event held in a public forum.  The issue then is whether Parson's justification for removal of Rothe-Kushel from his speaking position and the auditorium satisfies the standard.  It does not.

At bottom, when they removed Rothe-Kushel from the microphone and auditorium, Parsons (and Hawkins) improperly used a "heckler's veto" based on the audience's or some sponsor's reaction to the content of Rothe-Kushel's questions and exchanges with Ambassador Ross.  This is contrary to the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Boos v. Barry*, 485 U.S. 312, 322 (1988) (in public debate, insulting and even outrageous speech must be tolerated to provide adequate breathing space to the freedoms protected by the First Amendment).  A "heckler's veto" is an impermissible content-based restriction on speech where it is prohibited – or halted – due to anticipated disorderly or violent reaction of the audience. *Brown v. Louisiana*, 383 U.S. 131, 133 n. 1 (1966); *see also Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123 (1992) (ordinance allowing adjusted parade fees based on anticipated hostility to speech and concomitant higher security cost invalidated).

The "heckler's veto" analysis also applies where, as here, the police restrict speech that is taking place.  *Terminiello v. City of Chicago*, 337 U.S. 1 (1949); *Frye v. Kansas City Police Dep't*, 375 F.3d 785 (8th Cir. 2004).  In this context, the question is whether the removal was based on the content of the speech.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  While Parsons claims that his conduct was reasonable because, he contends, Rothe-Kushel was

creating a disturbance in the auditorium or was disturbing the peace[8], there is no substantial evidence from which a fact finder could conclude that a disturbance was occurring or Rothe-Kushel was creating a disturbance or disturbing the peace. To the contrary the evidence establishes that he was ejected because of the content of his speech. PSF ¶¶ 60-69, 81-89.

The behavior of principals associated with the sponsoring organizations in pre-arranging what would be done were there to be a "protester" or a "disturbance" and their hand-signaling to get the microphone silenced while Rothe-Kushel was engaging with Ross in a peaceful manner undermines the notion that a disturbance was the cause of his removal and supports the conclusion that the content of his speech was why he was removed. PSF ¶¶ 4-10, 71-74. Sgt. Satter, who had been told – he presumed by Hawkins or Parsons – that Rothe-Kushel had asked a weird question about 9/11, understood that the "weird" question was related to why Rothe-Kushel was approached in the auditorium. PSF ¶¶ 67-69. Rothe-Kushel's actions and behavior were consistent with normal Q-and-A at KCPL events. PSF ¶ 61. His tone and volume were consistent with normal behavior; he spoke for 90 seconds in a civil tone of voice, so, in the view of the Library, as expressed by its Executive Director, objections had to be about the content. *Id*.; *see also* PSF ¶¶81 (Rothe-Kushel did not interrupt the speaker and was within the bounds of normal speech); ¶ 82 (it was Kemper's view that the content of the question could have been the only reason for the incident because there was nothing in his actions that should have provoked the incident); ¶ 83 (Rothe-Kushel only raised his voice to Hawkins, not to Ross). Indeed, Rothe-Kushel did not raise his voice until he was aggressively grabbed and pushed by Parsons and Hawkins. PSF ¶ 60. The audience's audible response to the interchange was not threatening but was the sign of an engaged and interested audience. PSF ¶ 63. In Bethany Rowell's experience

---

[8]Parsons' Suggestions, Doc. 225, at 4.

with the Library's Q-and-A sessions nothing occurred during the interchange between Rothe-Kushel and Ross that would warrant his ejection from the auditorium.  PSF ¶ 65.

The third speaker after Rothe-Kushel – a woman with an Israeli accent – spoke on a non-controversial matter at greater length than Rothe-Kushel.  Her total time at the microphone was over five minutes and just less than twice as long as Rothe-Kushel was at the microphone. This speaker was not ejected or silenced lending substantial support for the conclusion that Rothe-Kushel was ejected mid-sentence not for the length but for the content of his speech. JCF's Ex. 2, KCPL Video at 9:59-15:09.

Leslie Case, the Library's audio operator, considered Rothe-Kushel's remarks to be "long winded but civil" and even when TLI's Kim Rausch "raised her hand in a slicing motion while looking at" her, Case did not cut the microphone because Rothe-Kushel's tone was courteous and well-mannered."  PSF ¶ 76.  It was not until Case cut off the microphone in accordance with Library practice because she thought Stein was going to ask Rothe-Kushel to relinquish the floor so the request would not be heard by the entire audience that Hawkins, followed almost simultaneously by Parsons, approached Rothe-Kushel in an "aggressive fashion" to remove Rothe-Kushel.  PSF ¶¶ 77-80, 87.

This evidence is more than sufficient to create a genuine issue of material fact as to whether Rothe-Kushel was being removed (and subsequently arrested) because of the content of his speech and not because he had created a disturbance or was disturbing the peace – no actual disturbance having occurred.  Indeed, the greater weight of the evidence would lead a fact finder to conclude that Rothe-Kushel had acted appropriately until accosted and that it was what he was saying that caused his removal in violation of the bedrock First Amendment principle that the expression of an idea cannot be repressed because of its content.

49

Moreover, Parsons' assertion that Rothe-Kushel was not interfered with must be rejected.[9] It is clear from the videos that the interchange between Rothe-Kushel and Ross had not concluded and that, in fact, Rothe-Kushel was interrupted and grabbed between saying the words "September" and "Eleventh". JCF's Exs. 1 and 2; Pf's Ex. 20; PSF ¶ 85. The interruption violated his First Amendment rights.

### 2. Even if there was probable cause to arrest Rothe-Kushel, his First Amendment rights were violated.

Even if Parsons had arguable probable cause to arrest Rothe-Kushel, which Rothe-Kushel denies, that arrest violated Rothe-Kushel's First Amendment rights. Grabbing and pushing Rothe-Kushel away from the microphone while he was speaking forced the end of that public expression in violation of the Police Department's explicit policy. PSF ¶ 115-117 (citing Annex D). That policy provides that police officers are "mandated" to protect citizens in the exercise of their rights, including the right to protest, even if such activities "will result in some disruption in varying degrees of normal activities". PSF at ¶¶ 115-118. And even if those activities "become disruptive . . . the *primary* police objective is to restore order. PSF at ¶ 117 (emphasis added). Additionally, police officers are trained to permit "minor inconveniences" to those affected by First Amendment protected activities instead of making an arrest. PSF at ¶ 118. For Kansas City police officers it was clearly established by policy and training that such arrests of protestors should not be made.

Not only was Rothe-Kushel viewed as a "protestor" (PSF ¶¶ 4, 7, 8), he was also seen by Parsons as expressing viewpoints inimical to Parsons, as being an "anti-Jewish activist", as trying to prevent others from speaking, and – falsely – as having engaged in anti-Jewish acts

---

[9] Parsons' Suggestions, Doc. 225, at 7.

worthy of being labeled a bias crime, a label that would normally be reported to other law enforcement agencies.  PSF ¶¶ 97-111.  Where such punitive motives are layered on an arrest in violation of training and policy that protect First Amendment activities, the presumption of regularity disappears and arrests motivated by an improper motive support a cause of action if causation to an injury is established.  If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim because the circumstantial evidence of the causal connection is strong or not rebutted.  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  *See also Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968); *Crawford-El v. Britton*, 523 U.S. 574 (1998).

### B.  Rothe-Kushel's Fourth Amendment rights were violated.

Rothe-Kushel's Fourth Amendment rights were violated for the same reasons he was falsely arrested because as developed, *infra* at III.A., there was no probable cause to arrest him for trespass, for resistance or obstruction, nor for disorderly conduct or breach of the peace.

### C.  Plaintiff's First and Fourth Amendment rights were clearly established.

#### 1.  The First Amendment right was clearly established.

The description of why interrupting Rothe-Kushel's speech violated his First Amendment rights, *supra* at II.A.1, incorporates and relies on case law that dates back to 1949 when the Supreme Court held in *Terminiello* that the "heckler's veto" analysis applies where police restrict speech that is taking place.  In 1989, the Court explained in *Rock Against Racism* that the controlling question was the fact-based determination of whether the removal was based on the content of the speech..  There can be no serious dispute that the First Amendment right Parsons

51

violated was clearly established.

## 2. The Fourth Amendment right was clearly established.

The Fourth Amendment "requires that arrests must be based on probable cause." *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1310 (8th Cir. 2014). The Fourth Amendment right of citizens not to be arrested without probable cause *is clearly established*. *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996) (emphasis added). Law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so – *provided that the mistake is objectively reasonable*. *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991). This sometimes is referred to as "arguable probable cause." *Habiger*, 80 F.3d at 295.

Probable cause exists when the totality of the circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime. *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). Courts give law enforcement officers latitude in interpreting and drawing inferences from factual circumstances," *id.*, but such latitude is not without limits. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Both inculpatory and exculpatory evidence are relevant to whether the officer has probable cause. *Id.* (citing *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.), *cert. denied*, 488 U.S. 822 (1988); 488 U.S. 851 (1988)). Thus, this Court must analyze the weight of *all* the evidence – not merely the sufficiency of the incriminating evidence – in determining whether there was probable cause to arrest Rothe-Kushel for trespass and resisting or obstructing arrest.

It was not objectively reasonable to seize and arrest Rothe-Kushel in violation of long-established fundamental First Amendment principles and contrary to established police department policies and training. And it was not objectively reasonable to falsely arrest him for

alleged offenses that did not occur.

### III. PARSONS FALSELY ARRESTED ROTHE-KUSHEL.[10]

    **A. There was no probable cause for arresting for trespass, for resistance or obstruction, nor for disorderly conduct or breach of the peace.**

Municipal ordinances are required to be consistent with state law on the same subject. Thus, Kansas City may only enact ordinances "in conformity" with state law on the same subject. If the city ordinance conflicts with a general law of the state, it is void. *City of Kansas City v. Carlson*, 292 S.W.3rd 368, 371 (Mo. App. 2009).

There was no probable cause for arresting Rothe-Kushel for trespassing. Rothe-Kushel was charged for refusing to leave when asked, Pf's Ex. 21 (trespass ticket), but he was never asked or told to leave. Without the critical element of a "refusal" there was not even arguable probable cause to arrest Rothe-Kushel for trespass.

> When a business, or public facility is involved and a portion is open to the public, a person who enters upon an area open to the public at a reasonable time and in a reasonable manner, has the implied consent of the owner to enter the premises under a limited privilege, and as long as the privilege, based upon implied consent, is within the conditional or restricted consent of the owner to enter, the implied consent remains. So long as there is no substantial evidence of the stay being prolonged, boisterous conduct, breach of peace, blocking of entranceways, interference with the public, picketing, or other conduct which would revoke the implied consent of the owner inconsistent with the purposes of the business or facility, there is no trespass until such conduct by the person occurs or the person is requested to leave by an agent or representative of the owner or possessor and refuses to do so.

*St. Louis County v. Stone*, 776 S.W.2d 885, 888 (Mo. App. 1989). The charges of trespass in *Stone* were based upon a county ordinance, but the court of appeals relied upon the RESTATEMENT (SECOND) OF TORTS §§ 168, 181 (1965) and 75 AM. JUR. 2D *Trespass* § 41 (1964), because general principles of trespass law apply to local ordinances and controlled the

---

[10]Plaintiff is abandoning his state law battery claim against Parsons. Parsons' Suggestions, Doc. 225, at 12.

case.

Under state trespass law, a person who is disruptive may be asked to leave but trespass is not authorized unless he refuses to leave. *Green v. Nocciero*, 676 F.3d 748, 751 (8th Cir. 2012). *See Kansas City v. Pigerre*, 625 S.W.2d 938 (Mo. App. 1981) (trespass ordinance must be consistent with MO. REV. STAT. § 569.140).

Here, KCPL was the owner of the property and Rothe-Kushel's conduct was completely within KCPL's standards for participating in a public event at a public library. PSF ¶¶ 28-46. No representative of the owner requested that he leave. PSF ¶ 88. In fact, the representative of the owner strongly objected and protested that Rothe-Kushel had a right to remain. PSF ¶¶ 89. And, even if one were to assume that the Jewish Community Foundation was the rightful possessor, its representative, Hawkins, did not request that Rothe-Kushel leave. PSF ¶¶ 88, 90. Finally, even if it is assumed that Hawkins or Parsons requested Plaintiff to leave, he did not refuse to leave. PSF ¶¶ 90.

Nor was there probable cause to arrest Rothe-Kushel for resisting or obstructing arrest. "A person resists arrests when: (1) she knows or reasonably should know a law enforcement officer is making an arrest; and (2) she resists the officer by using or threatening violence or physical force; (3) for the purpose of preventing the officer from effecting the arrest. . . . Under section 575.150.1 resisting arrest is a crime if the person being arrested resists by one of five separate means: using violence; threatening to use violence; using physical force; threatening to use physical force; or by fleeing." *State v. Caldwell*, 352 S.W.3d 378, 383-384 (Mo. App. 2019) (quoting *State v. Belton*, 108 S.W.3d 171, 175 (Mo. App. 2003)).

The ordinance that Rothe-Kushel was charged with violating for resisting or obstructing refers to MO. REV. STAT. § 575.150 as its interpretive note and it must be so interpreted. PSF ¶

54

52.  The evidence is that, at most, Rothe-Kushel flinched when first touched upon being arrested. PSF ¶ 94.  Such conduct was not violent or threatening of violence and it certainly was not for the purpose of preventing an arrest.

Rothe-Kushel's conduct also cannot constitute disorderly conduct or breach of the peace. When an ordinance, whether disorderly conduct or breach of peace, punishes only spoken words it cannot pass constitutional scrutiny unless it is interpreted to only apply to "fighting words", "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  *Gooding v. Wilson*, 405 U.S. 518, 521-523 (1972).

In Missouri, breach of peace ordinances in both St. Louis and Kansas City have been interpreted  to comply with the guidelines set by the United States Supreme Court in *Gooding*. *Kansas City v. Graham*, 502 S.W.2d 411, 414-415 (Mo. 1973) (citing *City of St. Louis v. Slupsky*, 162 S.W. 155 (Mo. 1913); *City of Kansas City, Missouri v. Thorpe*, 499 S.W.2d 454, 458 (Mo. 1973) (in Missouri "it now is and always has been the law that 'breach of the peace,' unless otherwise defined in the ordinance or statute using the term, refers only to acts or conduct inciting violence are intended to provoke others to violence.").  The same principle applies to "disorderly conduct" ordinances.  *City of Raymore v. O'Malley*, 527 S.W.3d 857, 865 (Mo. App 2017).

Rothe-Kushel's words were presented in a civil tone and were not "fighting words" intended to provoke others to violence.  PSF ¶ 61, 76, 81.  Although the ideas of Rothe-Kushel's speech provoked a reaction by the crowd, protected speech may not be shut down by police officers exercising a "hecklers veto".  The "mere possibility of a violent reaction to Ms. Lewis's speech is simply not a constitutional basis on which to restrict her right to speak. . . . The First Amendment knows no heckler's veto." *Lewis v. Wilson*, 253 F.3d 1077, 1081-1082 (8th Cir.

55

2001) (citing, *inter alia*, *Cohen v. California*, 403 U.S. 15, 23 (1971); *Forsyth County, Georgia*, 505 U.S. at 134-35).

### B. Parsons acted with reckless disregard of Rothe-Kushel's rights or with bias or bad faith animus toward Rothe-Kushel so is not entitled to official immunity.

Official immunity does not apply where a police officer claiming to be cloaked with that immunity violated someone's rights while acting in reckless disregard for those rights, or where the officer acted with bias or malice. Official immunity does not apply to discretionary acts done in bad faith or with malice. *Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466, 479 (Mo. App. 2005). An act is done with malice when the conduct is based on bad faith or "when it is done . . . manifesting a reckless indifference to the rights of others." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986). And in Missouri this exception to the official immunity doctrine is often a jury question. Where a person arrested may not have committed the offense for which he was arrested, a "jury should be given an opportunity to consider all the evidence . . . and decide whether or not . . ." the officer acted in bad faith or with malice when he arrested the person. *Blue*, 170 S.W.3d at 480.

Here there is sufficient evidence that Parsons, regarding Rothe-Kushel as a "protestor", PSF ¶ 4, 7, 8, acted in bad faith, acting on his bias toward Rothe-Kushel, PSF ¶¶ 97-111, or in reckless disregard for the rights afforded by the First Amendment, or acted in violation of his training and the applicable police department policy Annex D governing protests. PSF ¶¶ 115-118. That evidence is more than sufficient under Missouri law to deny Parsons the protection of official immunity, at least at summary judgment.

### CONCLUSION

For all of the above reasons, this Court should deny Defendant Parsons' Motion for Summary Judgment.

Respectfully submitted,

LAW OFFICE OF ARTHUR BENSON II


By  s/ Jamie Kathryn Lansford
Arthur A. Benson II  Mo. Bar No. 21107
Jamie Kathryn Lansford  Mo. Bar No. 31133
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
abenson@bensonlaw.com
jlansford@bensonlaw.com

and

LAW OFFICE OF FRED SLOUGH


By  s/ Fred L. Slough
Fred L. Slough   Mo. Bar No. 23915
2800 City Center Square, 1100 Main Street
Kansas City, Missouri  64105
(816) 309-2644
(816) 472-6009 (telefacsimile)
fred@fredslough.com

Attorneys for Plaintiff Rothe-Kushel


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing was filed and served via the Court's electronic filing system on counsel listed below this  23rd  day of December, 2019:

Nicolas Taulbee
Assistant Attorney General
Office of Missouri Attorney General
Eric Schmitt
615 E. 13th Street, Suite 401
Kansas City, Missouri  64106
(816) 889-5000
(816) 889-4006 (telefacsimile)
nicolas.taulbee@ago.mo.gov

Attorneys for Defendants Leland Shurin, Nathan Garrett,

57

Mark Tolbert, Don Wagner, Mayor Quentin Lucas,
Chief Richard Smith, Michael Satter, Brent Parsons,
and Michael Curley

and

Louis A. Huber III  Mo. Bar No. 28447
Daniel R. Young  Mo. Bar No. 34742
Michael P. Schaefer  Mo. Bar No. 59308
Schlee & McCarthy, P.C.
4050 Pennsylvania, Suite 300
P.O. Box 32430 (zip: 64171-54630)
Kansas City, Missouri  64111
(816) 931-3500
(816) 931-3553 (telefacsimile)
lhuber@schleelaw.com
dyoung@schleelaw.com
mschaefer@schleelaw.com

Attorneys for Defendants Jewish Community
Foundation of Greater Kansas City


  s/ Jamie Kathryn Lansford
Attorney for Plaintiff Jeremy Rothe-Kushel

58